**Robert Henry McDOWELL,**
**Petitioner–Appellant,**

v.

**Gary W. DIXON, Warden, Central**
**Prison, Raleigh, North Carolina,**
**Respondent—Appellee.**

No. 87–4006.

United States Court of Appeals,
Fourth Circuit.

Argued April 7, 1988.

Decided Oct. 3, 1988.

James Elliot Ferguson, II (Richard A. Rosen, Julius L. Chambers, Charlotte, N.C., Richard H. Burr, III, on brief), for petitioner-appellant.

Barry Steven McNeill, Asst. Atty. Gen. (Lacy H. Thornburg, Atty. Gen., Richard N. League, Sp. Deputy Atty. Gen., Raleigh, N.C., on brief), for respondent-appellee.

Before WINTER, Chief Judge, ERVIN, Circuit Judge, and BUTZNER, Senior Circuit Judge.

HARRISON L. WINTER, Chief Judge:

Robert Henry McDowell was convicted of first degree murder and felonious assault in the Superior Court of Johnston County, North Carolina on December 10, 1979. He was sentenced to death for the murder conviction and to a term of twenty years for the assault conviction. *State v. McDowell*, 301 N.C. 279, 271 S.E.2d 286 (1980), *cert. denied*, 450 U.S. 1025, 101 S.Ct. 1731, 68 L.Ed.2d 220 (1981). McDowell pursued state postconviction remedies, and, after an evidentiary hearing, the trial court granted him a new trial. The Supreme Court of North Carolina vacated the trial court's order, *State v. McDowell*, 310 N.C. 61, 310 S.E.2d 301 (1984), and on remand the trial court denied any further relief. The Supreme Court of North Carolina declined to review the denial of relief, and a petition for a writ of certiorari was denied by the Supreme Court of the United States. *McDowell v. North Carolina*, 476 U.S. 1165, 106 S.Ct. 2292, 90 L.Ed.2d 732 (1986). McDowell then filed a petition for writ of habeas corpus in the district court, which was denied. The court also denied a motion to alter or amend its judgment of denial.

McDowell appeals, and we reverse. We conclude that the nondisclosure of exculpatory evidence by the prosecutor denied McDowell due process of law. We direct that the writ issue unless McDowell is tried anew in a reasonable period to be allowed by the district court.

## I.

During the night of July 14, 1979, some-one entered the bedroom of fourteen-year-old Patsy Mason and four-year-old Carol Ann Hinson at their residence in Sanford, North Carolina and assaulted them with a large knife. Patsy suffered serious injuries, but survived. Carol Ann was killed. The only direct evidence linking McDowell to the crime ,was Patsy's testimony identifying him as the assailant. Circumstantial evidence against McDowell consisted of the testimony of his girlfriend, Frances Jenkins, that McDowell had arrived at their home at 1:45 a.m., later than usual, and had behaved suspiciously. Police conducted a search of McDowell's dwelling and seized a machete knife, an instrument capable of having inflicted the type of wounds suffered by Patsy and Carol Ann, as well as nunchukhs and a flashlight, items which according to Patsy her assailant had possessed. The prosecution could adduce no evidence of fingerprints, blood, hair, body secretions or other physical evidence linking McDowell to the crime. There was also no evidence of any inculpatory statements made by McDowell.

In addition to the identification testimony of Patsy, the prosecution presented the testimony of Marvin Stone, who, shortly after midnight, had "caught glimpses of a silhouette of a person on a bicycle" leaving the Mason home and pedaling down the street. About five minutes later he heard some screaming, and he investigated. Stone peered into a glass storm door into one of the Masons' bedrooms, and saw a small girl and a child lying on the floor. He returned home because there did not appear to be anything amiss. Several minutes later he heard more screaming. He awakened his parents and was returning to the Masons' when the police arrived.

Also present in the Mason house on the evening of July 14, 1979 were Patsy's parents, John and Sarah Mason, and her baby brother, Jerome. John Mason testified that he fell asleep watching television at 11:00 p.m. and awoke at 1:00 a.m.. He made no claim that he awakened because of the screams. After waking, Mr. Mason checked on the children as he usually did before he went to bed for the evening, and upon discovering that they had been injured, he called for an ambulance. He then awakened his wife, who was still sleeping.

## II.

McDowell contends that he was denied a fair trial, and hence due process of law, because the prosecution had in its file exculpatory evidence not disclosed to the defendant's counsel, despite a general request therefor, and that this evidence was not otherwise brought out at trial. He thus claims that the prosecution has violated the principles of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) and its progeny, by failing to disclose evidence material to guilt or punishment. He also argues that the prosecution violated the principle first enunciated in *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935) that knowing use of false testimony is inconsistent with due process, because, in his trial, it permitted its witnesses to give a false impression of what transpired when it possessed evidence to indicate that falsity. Finally, McDowell argues that we should stay decision pending resolution of *Franklin v. Lynaugh, cert. granted,* —— U.S. ——, 108 S.Ct. 221, 98 L.Ed.2d 180 (1987), which presents the question whether jury instructions pursuant to Tex.Crim.Proc.Code Ann. § 37.071(b), the sentencing provision for capital crimes, violate the Court's decision in *Lockett v. Ohio*, 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978). McDowell claims that the instructions given by the trial court in the sentencing phase of his trial were identical to those given in *Franklin. Franklin v. Lynaugh,* —— U.S. ——, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988). Because we think that McDowell's first argument is meritorious and adoption of it adequately disposes of the case, we do not consider his other contentions. Nor do we think it necessary to consider the effect of *Franklin* on this case.

There were three separate items of undisclosed evidence. First, there existed direct evidence potentially damaging to the

reliability of Patsy's identification of McDowell as her attacker and Patsy's credibility or memory. Patsy was initially questioned about the identity of her attacker in the early morning hours of July 15, 1979, less than three hours after the attack, by Sanford police officer W.A. Baker in the Lee County Hospital. The following exchange occurred:

Q. Do you know who did this to you?
A. Patsy motioned with her head in a negative manner.
Q. Does he live in your neighborhood?
A. Motioned with her shoulder, I don't know.
Q. Was he black or white?
A. *White.* (emphasis added)

An interview conducted by SBI agent Stewart with Terry Hinson, (Carol Ann's mother and Patsy's stepsister), disclosed that she "knew that Patsy had already told that the people who did it were white." Patsy's description to SBI officer Scheppf on July 17, 1979, was that she was uncertain as to whether the man was black or white. Subsequently, on July 18, 1979, Patsy stated that her attacker had been black, with a medium afro and a medium build, and that she did not know the man. Patsy later identified McDowell from a photo spread. Defense counsel were apprised only of Patsy's July 18 description that her assailant was black, and of the results of the photo spread. At trial Patsy testified that she had always described her attacker as a black man with *flat* hair, big eyes and a flat nose, and that she had seen McDowell before briefly on only one occasion.

The second item of undisclosed evidence came from an interview between Agent John Walker and an eleven-year-old neighbor of the Masons, Jerry Stone. Stone reported seeing a black male approach the Mason home riding a bicycle "white in color," at about 11:30 p.m. on July 14. According to Stone, the bicyclist was "approximately 6'0", 20 years old, very skinny, very dark skinned, no hat, no shirt, light green medium cutoff shorts and believed to be wearing shoes, possibly black boots up to one foot high." The bicyclist shone a flashlight at the Mason residence, ap-

proached the front door, and was admitted into the house. Stone then examined the ten-speed bicycle, which he described as "a Huffy brand ... white in color, ... no fenders, no horn and no front headlight." Stone then knocked on Patsy's side door, and when she opened the door, asked her "who the colored boy was on the white ten speed bicycle." Patsy replied that she did not know, and that he might be talking with her parents. Jerry Stone then left and went home. Several minutes later, he heard "a ten speed bicycle travelling real fast down Third Street."

The final item of undisclosed evidence consisted of police reports prior to July 14 of white intruders in the Mason home. Hope Spivey and Sheila Jackson, young cousins of Patsy, told of two separate incidents, one several weeks prior to the crime, and one just a few hours before the crime. A police report revealed that on June 25, according to Hope, Hope, Patsy and Sheila had been in an upstairs bedroom when they were distracted by a noise outside their room. They turned toward the bedroom door and suddenly saw a man, whose face was covered by a mask or was "red", peering in their bedroom door. The girls screamed and the intruder left. John Mason summoned the police, who came and made a written report of the incident.

The second incident occurred on July 14, when Patsy's cousins observed a "white/male" intruder near the Masons' basement stairway, wielding a knife. Again, the police were summoned and, despite the girls' vivid recollection of the intruder, the police dismissed the girls' accounts after an investigation of the basement turned up no evidence to support the story.

III.

The law to be applied when the prosecution fails to disclose exculpatory evidence to a defendant is relatively uncomplicated. *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), held, as an extension of *Mooney v. Holohan*, 294 U.S. 103, 55 S.Ct. 340, 79 L.Ed. 791 (1935), that

The suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.

*Id.* 373 U.S. at 87, 83 S.Ct. at 1196–97. The Court explained the rationale of the rule as "not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused.... A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty ... casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice ...," even though the prosecutor's failure to divulge was not intentionally deceptive. *Id.* at 87–88, 83 S.Ct. at 1197.

The *Brady* doctrine was restated and amplified in *United States v. Agurs,* 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). It acknowledges that *Brady* applies in four different situations: first, where the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony. In those instances the conviction is "fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* at 103, 96 S.Ct. at 2397 (footnotes omitted). The *Brady* doctrine also applies when there has been suppression of *specific* evidence described in a pretrial request. In that event, the Court held, the conviction or the punishment, as the case may be, cannot stand if the suppressed evidence is material. *Brady* also applies in two other instances where the defense makes no pretrial request for exculpatory evidence or where, lacking specific knowledge of what to request, the defense makes only a general request for exculpatory material.

In none of the three latter cases does the defendant need to demonstrate that the suppressed evidence would have resulted in acquittal. This very strict standard would not sufficiently encourage the "prosecutor's obligation to serve the cause of justice." *Id.* at 111, 96 S.Ct. at 2401. The Court has framed the issue instead by holding that

The proper standard of materiality must reflect our overriding concern with the justice of the finding of guilt. Such a finding is permissible only if supported by evidence establishing guilt beyond a reasonable doubt. It necessarily follows that if the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed

*Id.* at 112, 96 S.Ct. at 2401–02 (footnote eliminated).

*United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985), considered the standard of materiality to be applied in determining whether a conviction should be reversed because the prosecution failed to disclose requested evidence that could have been used to impeach prosecution witnesses. The Court rejected any distinction between impeachment evidence and exculpatory evidence, and upheld its prior ruling in *Giglio v. United States,* 405 U.S. 150, 154, 92 S.Ct. 763, 766, 31 L.Ed.2d 104 (1972), that " 'nondisclosure of evidence affecting credibility falls within th[e] general rule [of Brady].' " 473 U.S. at 677, 105 S.Ct. at 3381. Elaborating on *Agurs,* the Court concluded that "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." The Court stated that this standard is identical to that adopted in *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed. 2d 674 (1984), to determine the propriety of granting a new trial due to incompetence of counsel. A court's inquiry in determining the materiality of the undisclosed evidence, as in *Strickland,* should "consider directly any adverse effect that the prosecutor's failure to respond might have had on the preparation or presentation of the defendant's case." *Bagley,* 473 U.S. at 683, 105 S.Ct. at 3384. The Court also held that this standard is applicable to "no request", "general request", and "specific request"

cases of prosecutorial nondisclosure. *Id.* at 682, 105 S.Ct. at 3383.

As we have already mentioned, the standard of materiality on appeal is not altered because of the lack of misconduct on the part of the prosecution. *Agurs* directly addressed this issue, and determined that "[i]f the suppression of evidence results in constitutional error, it is because of the character of the evidence, not the character of the prosecutor." 427 U.S. at 110, 96 S.Ct. at 2401. It follows that insignificant evidence deliberately withheld by a vindictive prosecutor who believes it to be important will not give rise to constitutional error, but if "evidence highly probative of innocence is in his file, he should be presumed to recognize its significance *even if he has actually overlooked it.*" *Id.* (Emphasis added). It is therefore no argument that, in this or any other criminal case, the prosecution did not recognize the importance of the undisclosed evidence, or would not have withheld the evidence had it been requested. "The *Brady* rule is based on the requirement of due process. Its purpose is not to displace the adversary system as the primary means by which truth is uncovered, but to ensure that a miscarriage of justice does not occur." 473 U.S. at 675, 105 S.Ct. at 3380. It is the fairness of the trial, not of the prosecutor's conduct which is at issue.

*Agurs* has clearly indicated that not all evidence favorable to the defendant will create a reasonable doubt. *Agurs* itself rejected the claim of the defendant that evidence of the homicide victim's prior record of weapons violations created a reasonable doubt where none before had existed. The Court noted that the prior record "did not contradict any evidence offered by the prosecutor, and was largely cumulative...." 427 U.S. at 113–14.

By contrast, in *Norris v. Slayton,* 540 F.2d 1241 (4 Cir.1976), we considered a set of circumstances very similar to those at issue here. In *Norris,* the investigating officer had stated in a report that the rape victim had been unsure whether the defendant was her assailant when the police first asked her to identify him. The prose-

cution knew of this report but failed to furnish a copy of it to the defense. The victim subsequently testified at trial that when she first confronted Norris, she was certain that he was her assailant. We concluded that the report "was evidence which had a direct bearing upon the critical issue in the case and might 'reasonably have weakened or overcome testimony adverse to the defendant.'" *Id.* at 1244, *quoting Barbee v. Warden, Maryland Penitentiary,* 331 F.2d 842, 847 (4 Cir.1964). The report would have weakened the victim's credibility, as well as the accuracy of her identification of the defendant as her assailant. In an addendum to our opinion in *Norris,* we further stated that since the omitted evidence "was of such a nature as to raise a substantial likelihood that it would have affected the result in Norris' trial," *Agurs,* decided after *Norris* had been argued, but before its publication, did not require a different result.

In the case at bar the critical issue was the identity of the assailant. Robert McDowell is unmistakably black, and Patsy Mason first claimed that her assailant was white. Originally she claimed that he had shoulder length hair, later that he had an afro, and ultimately that his hair was flat. The state attempts to distinguish *Norris* from this case by stressing that Patsy has always *identified* McDowell as her attacker when shown pictures of him. This contention unjustifiably diminishes the value of the prior inconsistent description in impeaching Patsy's credibility, or memory or both, and ignores the fact that, "[i]mpeachment evidence, however, as well as exculpatory evidence, falls within the *Brady* rule." *Bagley,* 473 U.S. at 676, 105 S.Ct. at 3380. Whether Patsy testified truthfully and accurately determined the guilt or innocence of Robert McDowell. Hers was the sole identification testimony and where it was not, as here, incontestably corroborated by circumstantial evidence, the conclusion is inescapable that had the jury known of her prior inconsistent identifications, there was a reasonable probability that the outcome of McDowell's trial might have been different. Certainly it was enough to create a reasonable doubt of

McDowell's guilt that did not otherwise exist.

The prosecution also argues that Patsy's first account is not material because Officer Baker described her as "semi-conscious" when she uttered the fact that her assailant had been white, although several physicians testified that she had been alert and conscious at the time. We recognize that had Patsy's prior inconsistent identifications been proved, there was evidence to minimize or explain away their damaging effect on the prosecution's case. But that evidence is not so overwhelming that we can say that the jury inevitably would have been persuaded that her in-court identification was entirely truthful and conclusive, and that her memory and credibility were beyond reproach. Thus we are not persuaded that the inconsistent prior identifications were not material as defined in *Bagley* and *Agurs*.

Another significant aspect of Patsy's account of her assailant's features concerns her prior acquaintance with McDowell. We do not doubt that the strategy counsel used to defend McDowell was influenced by their lack of knowledge of Patsy's first identifications of her attacker, and that the trial might have taken a different course "had the defense not been misled by the prosecutor's incomplete response." *Bagley* at 683, 105 S.Ct. at 3384. At trial, Patsy testified that she had seen McDowell once before the night of the attack, but only briefly. In fact, defense counsel had evidence that Patsy had frequented "Black" nightspots around Sanford, and the owner of such a nightspot told police that the two knew each other, as did a friend of Terry Hinson's.* Although the defense counsel thus knew of this discrepancy in her testimony, we surmise that they chose not to prove it, because prior acquaintance between victim and defendant would have tended to support Patsy's ability to identify her assailant accurately. In light of Patsy's first description of her assailant as a white man, however, of which defense counsel was ignorant, Patsy's prior association with McDowell makes her subsequent identification of him as the attacker even less credible, and the likelihood of a different result in a new trial even greater.

While we think that suppression of the evidence of inconsistent identification alone is sufficient to vitiate McDowell's conviction, that conclusion is reinforced by consideration of other exculpatory evidence that was suppressed.

Jerry Stone's account of the events which occurred at the Mason home on July 14 is evidence which the jury was entitled to hear. His account calls Patsy's version of the night into question in two different respects. First, Patsy gave no account of Jerry Stone's visit in her own testimony which tracked her recollection of that evening from 6:00 p.m. until she lost consciousness from her wounds. Moreover, Jerry Stone's description of the man who visited the Mason home differs from Patsy's initial identification in several significant respects. Stone reported that the man wore no shirt and light green cutoff shorts, and Patsy testified that her assailant wore a dark pullover and jeans. If a jury found Jerry Stone credible, the fact that John Mason may have admitted a black male into his house when he claims to have been asleep might seriously undermine his credibility as a witness as well.

Finally, evidence of a white intruder in the Mason home hours before the attack demonstrates that there might have been another person who had motive or opportunity to commit the crime. Although Hope and Sheila Spivey subsequently testified at the post-conviction hearing that they had imagined the intruders, it is undisputed that they stood by their story at the time they were initially questioned about it by the police. It is the province of the jury to determine whether it believed the story, and if so, whether the incident had any bearing on the subsequent crime.

We summarize by stating there is not insubstantial evidence that Robert McDowell murdered Carol Hinson and assaulted Patsy Mason. However, the only direct

---

* The owner of the establishment also testified at the post-conviction hearing that John Mason told him to lie about the amount of time Patsy spent at his place if he was asked.

evidence presented by the prosecution is the eyewitness identification made by Patsy Mason. There is no evidence of matching fingerprints, bloodstains, body secretions, hair or fibers. The omitted evidence was not cumulative, and it was unquestionably contradictory of the prosecution's case against McDowell. In our view, the omitted evidence could have created a reasonable doubt in the minds of the jurors. We cannot say that even if the jury had been aware of the undisclosed evidence, it still would have had no reasonable doubt of McDowell's guilt of the crimes committed against Patsy and Carol Ann. It follows that McDowell was denied due process of law in his trial by the nondisclosure of the evidence that we have described.

We reverse the judgment of the district court and instruct it to issue the writ of habeas corpus, unless McDowell is tried anew within such reasonable period as the district court may fix.

REVERSED AND REMANDED.