Gerald Eugene STANO,
Petitioner–Appellant,

v.

Richard L. DUGGER, Robert A. Butter-
worth, Respondents–Appellees.

No. 87–3588.

United States Court of Appeals,
Eleventh Circuit.

May 1, 1990.

Mark Evan Olive, Georgia Resource Cen-
ter, Inc., Atlanta, Ga., for petitioner-appel-
lant.

Robert A. Butterworth, Atty. Gen. and
Margene A. Roper, Asst. Atty. Gen., Day-
tona Beach, Fla., for respondents-appellees.

Before TJOFLAT, Chief Judge, and
FAY, KRAVITCH, JOHNSON,
HATCHETT, ANDERSON, CLARK,
EDMONDSON and COX, Circuit Judges.

ANDERSON, Circuit Judge:

We review this case in banc primarily to
give further consideration to two of Stano's
claims: his claim under *Brady v. Mary-
land,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d
215 (1963); and his claim under *United*

*States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980).

Stano's first trial ended in a mistrial after the jury failed to reach a unanimous verdict. The major evidence against Stano at this first trial consisted of the confessions that Stano made on March 6, 1981, and August 11 and 12, 1981, to detectives Crow and Manis. In the second trial, Stano was found guilty of first degree murder of Cathy Scharf, and sentenced to death. The evidence against Stano in this retrial was substantially the same, with the addition of a jailhouse confession to inmate Clarence Zacke. The principal theory of the defense was that Stano tended to confess falsely. As set out more fully in part I of Judge Fay's opinion for the panel in this case, 883 F.2d 900, 903–04 (11th Cir.1989), Stano pursued his direct appeal and his post-conviction remedies under Rule 3.850 of the Florida Rules of Criminal Procedure, and then filed the instant Petition for Writ of Habeas Corpus in federal district court. The district court denied relief, and Stano appealed to this court.

The procedural posture of this case is that Gerald Stano has had the benefit of a limited evidentiary hearing only on his ineffective assistance of counsel claim, not on his other claims. There has been no evidentiary hearing, either in state court or in federal court, on Stano's *Brady* claim or his *Henry* claim.

■ If there has been no evidentiary hearing in state court on an issue raised on habeas corpus, one is required if the petitioner alleges facts which, if true, would entitle him to relief. *Townsend v. Sain,* 372 U.S. 293, 312, 83 S.Ct. 745, 757, 9 L.Ed.2d 770 (1963); *Porter v. Wainwright,* 805 F.2d 930, 933 (11th Cir.1986), *cert. denied,* 482 U.S. 918, 107 S.Ct. 3195, 96 L.Ed.2d 682 (1987). The petitioner will not be entitled to an evidentiary hearing when his claims are merely "conclusory allegations unsupported by specifics" or "contentions that in the face of the record are

wholly incredible." *Blackledge v. Allison,* 431 U.S. 63, 74, 97 S.Ct. 1621, 1629, 52 L.Ed.2d 136 (1977).

## I. *BRADY* CLAIM

■ A *Brady* violation occurs where: (1) the prosecution suppressed evidence; (2) the evidence was favorable to the defendant; and (3) the evidence was material to the issues at trial. *See United States v. Burroughs,* 830 F.2d 1574, 1577–78 (11th Cir.1987), *cert. denied,* 485 U.S. 969, 108 S.Ct. 1243, 99 L.Ed.2d 442 (1988). Suppressed evidence is material when "there is a reasonable probability that ... the result of the proceeding would have been different" had the evidence been available to the defense. *Pennsylvania v. Ritchie,* 480 U.S. 39, 57, 107 S.Ct. 989, 1001, 94 L.Ed.2d 40 (1987) (quoting *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985)) (plurality opinion of Blackmun, J.).

Specifically, Stano has alleged that the prosecution suppressed evidence that there was collusion between Crow, the police investigator; Donald Jacobson, Stano's defense attorney during the investigative stage; and Dr. Ann McMillan, the defense psychologist during the investigative stage. The alleged purpose of this collusion was to exploit Stano's mental vulnerabilities in order to coerce murder confessions, including confessions to the Scharf killing. Stano alleges that Dr. McMillan, at Jacobson's suggestion, gave Crow psychological information that would make this coercion more likely to succeed. He alleges that Jacobson assisted Crow in coercing the confessions, and that Crow used this information and assistance in his on-going elicitation of confessions. Stano alleges that Crow, obviously, knew of this collusion and the effect on Stano's confessions, and that such knowledge is imputed to the state.

Stano's petition and supporting appendices allege the following.[1] Stano was arrested on his first murder charge in April

---

1. Not all of the following evidence is *Brady* material. However, it is useful to view the *Brady* material in the context of the relevant allegations which support the need for an evi-

dentiary hearing. As indicated in the text, the principal *Brady* evidence claimed by Stano relates to the collusion between detective Crow and the defense attorney and psychologist.

1980. J.W. Gadberry, the officer who had first brought Stano in, participated in the early investigation, which was led by Sergeant Paul Crow. Soon after Stano's arrest, Don Jacobson was appointed as Stano's attorney, and he hired Dr. Ann McMillan as a defense psychologist. Both Crow and Jacobson were interested in writing books about their work with Stano if he turned out to be a serial killer.[2] There is evidence that Crow even hired a literary agent.[3]

Jacobson asked Dr. McMillan to find out if Stano was a serial killer and indicated that he was not interested in representing Stano unless he was. Jacobson instructed Dr. McMillan to tell Crow how best to interrogate Stano in order to elicit confessions, by exploiting Stano's mental vulnerabilities.[4] Crow used that psychological information in interrogating Stano, as described below.[5] He maintained close contact with Stano day after day and deprived him of contact with others. There were frequent long interrogation sessions at which Crow would not allow anyone else to be present.[6] Crow stated to a freelance writer that he could lead Stano to the correct result and that he would rehearse confessions with him.[7] Gadberry, the police detective, was with Stano at the time of an early murder confession in another case and stated that Crow led Stano to the body, not the reverse.[8]

Jacobson, an ex-FBI agent who also did some legal work for members of the police department, worked extensively with Crow and the state attorney. He often allowed members of the police investigatory team to interrogate Stano outside the presence of counsel.[9] Jacobson helped formulate the questions Crow would address to Stano. They urged Stano to confess to more killings in order to become eligible for an insanity defense.[10] Jacobson also advised Stano's parents to talk freely with Crow and Dr. McMillan.[11]

The information given by Dr. McMillan to Crow included Stano's psychological vulnerabilities. There is psychological evidence that Stano was susceptible to strong authority figures who relied on manipulation and that he could not appreciate the consequences of his confessions. Dr. McMillan now admits that she advised Crow to play on Stano's "grandiosity."[12] Other evidence suggests that Stano was likely to confess in order to gain attention. Gadberry, who was present at the early stage of the investigation, felt that Stano had an abnormal need for attention and affection due to mental illness, and that Crow exploited this. Another detective, who worked with Crow on another Stano

---

2. Petition for Writ of Habeas Corpus at 129, 134; Appendix 19 (Affidavit of Lissa Gardner re Ecker conversation); Appendix 16 (Gadberry Affidavit); Appendix 100 (Affidavit of Virginia Shubert re Detective Lehman conversation).

Hereafter, the Petition for Writ of Habeas Corpus filed in the district court is referred to as "Petition." The appendices referred to here and elsewhere in this opinion are those attached to the Petition.

3. Appendix 19 (Affidavit of Lissa Gardner re Ecker conversation).

4. The above information is from a statement made by McMillan. Petition at 133–34; Appendix 20 (Affidavit of Scharlette Holdman re McMillan conversation).

5. Petition at 127–28, 135; Appendix 16 (Gadberry Affidavit).

6. Petition at 144, *et seq.;* Appendix 16 (Gadberry Affidavit); Appendix 19 (Affidavit of Lissa Gardner re Ecker conversation). *See also* Petitioner's Exhibits 3–5 (interrogation with only Stano, Crow, and Lehman present).

7. Appendix 19 (Affidavit of Lissa Gardner re Ecker conversation).

8. Petition at 126, 171; Appendix 16 (Gadberry Affidavit).

9. Petition at 133; *see also* Petitioner's Exhibits 3–5 introduced at federal hearing (interrogation with only Stano, Crow, and Lehman present).

10. Petition at 133; Appendix 19 (Affidavit of Lissa Gardner re Ecker conversation); Petitioner's Exhibit 4 at 14 (Crow–Lehman interrogation); Appendix 29 (Affidavit of Eugene Stano).

11. Petition at 142; Appendix 29 (Affidavit of Eugene Stano); Appendix 20 (Affidavit of Scharlette Holdman re McMillan conversation).

12. Appendix 20 (Affidavit of Scharlette Holdman re McMillan conversation); *see also* Petition at 133.

murder investigation approximately eight months before the first Scharf confession, believed that in making confessions Stano "got carried away by delusions of grandeur." [13]

Stano's first murder confessions to Crow (relating to other killings) occurred in April and May of 1980. In May and June of 1980, Crow and Detective Lehman interviewed Stano in the Van Haddocks murder. The transcript of these interviews, at which counsel is not present, includes instances of promises,[14] threats,[15] and coaching.[16]

Stano has alleged that the collusion between Jacobson, Dr. McMillan, and Crow continued and tainted the confessions to the Scharf killing on which the instant conviction was based. In March 1981, Crow, Jacobson, and Dr. McMillan met with Stano's father, whom Jacobson had advised to cooperate with Crow.[17] They asked Mr. Stano to convince Stano to confess to more killings. He was told that more confessions were necessary to save Stano's life,

because if a pattern of insanity were established Stano would not be executed. Crow then gave Mr. Stano specific information relevant to various murders to use in asking Stano to confess. When Mr. Stano met with his son, Mr. Stano cried and begged Stano to confess, explaining the insanity theory to him and encouraging him to talk to Crow about other murders. Stano asked his father to contact Crow; a few days later, on March 6, 1981, Stano gave his first confession to the Scharf killing.

The evidence of collusion and coercion by Crow continued through the period of the second confession, which occurred on August 11 and 12, 1982. Crow had continued working with Stano on pending cases through late 1982. Detective Manis was contacted by Crow to the effect that one of Stano's confessions matched Manis's pending Scharf case. In January 1982, Manis, at Crow's suggestion, spoke to Stano, who denied committing the Scharf murder.[18]

---

**13.** Appendix 100 (Affidavit of Virginia Shubert re Detective Lehman conversation); *see also* Petition at 127.

**14.** Two examples follow:
   Crow: Gerald, the more you can come across with, we're gonna be able to take you out of this thing and put you in an isolated situation. Get you to . . .
   Stano: What do you mean by that?
   Crow: Out from the groups.
   Stano: No, I don't want no damned single cell.
   Lehman: You're gonna want, Gerald, believe me . . . there's a few people out here that are out to slit your . . . throat.

   .   .   .   .   .

   Lehman: And we don't want to see you get in that chair. We're keepin', we're trying to keep your ass out of it . . . as hard as we can.
Appendix 64.

**15.** The following are several examples from the interrogation:
   Crow: Now they can take you out of here, take you back up north. . . .
   Lehman: You ever see a Governor's warrant? . . . . It comes through with goddamned ribbons and doilies on it and it's like a goddamned skull. And it says you're gone whether you like it or not. . . .
   Crow: We gotta get some clout so we can keep you in the state.

   .   .   .   .   .

   Crow: You got problems.

Stano: Thanks.
   Crow: More problems than you think. Because two bodies is not going to make you eligible for insanity.
Appendix 66.

   Lehman: [T]he angle that you struck them with it, why that blade didn't break. And part of the way we're going to keep you down here is just like Sergeant Crow said—Pennsylvania and Jersey, man, they're chompin' at the bit.
   Stano: They think I did . . .
   Lehman: I don't want to see you get the chair. There's a guy coming up to get the chair next week in Georgia . . . I can't help but think that somewhere along the line you got the answers for us.
Appendix 67.

**16.** This is one of many examples:
   Lehman: Done a little research into this knife you're talking about, a retractable blade. The bone to the skull on Haddocks and the breast plate on Maher don't jive up with what you're telling us what you used on them. . . .
   Crow: You had to use a stronger blade than that, Gerald.
Appendix 67.

**17.** Petition at 142–43; Appendix 29 (Affidavit of Eugene Stano); Appendix 60 (Letter from Stano to Jacobson).

**18.** Petition at 158; Appendix 39 (Manis report).

Crow continued to visit Stano often at the prison during this period. In April, Crow initiated another meeting between Stano and Manis, but when Manis arrived, Crow had been inside and said that Stano would not talk.[19] During this entire time period, Crow and Stano were communicating: in June, Stano wrote to Crow and said he wanted to help by "telling you what you want to know about anything," and asked for contact with Howard Pearl, a public defender.[20] In July, Jacobson instructed him to make "a clean breast of everything" and that Crow was his best source; this letter had a covert copy to Crow.[21] On August 10, Stano was transferred to Crow's jail,[22] and a memo was circulated restricting access to Stano to Crow only.[23] On August 11, Manis interviewed Stano for 1½ hours, with Crow present part of the time; on August 12, 1982, the second Scharf confession was taped.[24]

Thus Stano has alleged that defense attorney Jacobson and defense psychologist McMillan colluded with the investigating detective, Crow, to take advantage of Stano's psychological weaknesses and to induce Stano to confess to the Scharf killing without regard to the truth thereof, but in order to promote the ulterior motives of Jacobson and Crow for fame and fortune.[25] Stano alleges that the March 6, 1981, and the August 11 and 12, 1982, confessions were thus coerced and tainted.

■ As noted above, to establish a violation of *Brady*, Stano must show that the omitted evidence—here, the alleged fact of the collusion among Crow, Jacobson, and McMillan—was favorable to the defense, was suppressed by the prosecution, and was material in that there is a reasonable probability that it would have changed the result of the trial had it been available to the defense. Undoubtedly, the alleged collusion among Crow, Jacobson, and McMillan, and the resulting effect on Stano's confessions, if true, would have been information favorable to the defense. The defense strategy at trial was to discredit Stano's confessions by showing that Stano had psychological weaknesses that led him to confess falsely. The suppressed evidence of collusion and coercion, including *inter alia* Crow's knowledge of his own misconduct and that of Jacobson, the covert copy of Jacobson's letter to Stano, and the tape of the prior confession revealing promises, threats, and coaching, all could have been used effectively at trial to further this defense strategy. The alleged facts of collu-

19. Petition at 158; Appendix 39 (Manis report).

20. Petition at 158; Appendix 76 (Stano letter to Crow).

21. The draft of the letter reads, in relevant part: "Your best source is still Sergeant Paul Crowe [sic] (send Paul a covert copy of this letter—have Paul stop by and pick this up and read it and throw it in the wastebasket)." Petition at 159; Appendix 15 (draft letter from Jacobson to Stano).

22. Petition at 159; Appendix 42 (Crow's notes).

23. The memo states that "under "NO" circumstances is this inmate to talk to ANY DETECTIVE—POLICE OFFICER—FEDERAL AGENT—STATE ATTORNEY OFFICE or ANY ATTORNEY. All appointments for this inmate to speak to ANY person will be arranged and handled by Sergeant Paul Crow "ONLY." Sergeant Crow will handle all telephone calls, visitors, etc. He will have NO contact with anyone, except jail personnel, in the normal course of security checks." Petition at 159; Appendix 47 (Copy of memo).

24. Petition at 160; Appendix 39 (Manis report); Advanced App. Vol. III, at 972 (Manis's trial testimony).

25. The state argues that the collusion between Jacobson, McMillan, and Crow was merely good trial strategy seeking to save Stano from the electric chair. However, this is but one perception of the facts. This interpretation of the facts is disputed by Stano, and Stano's version of the facts is alleged with considerable particularity. Stano alleges that it was not just good defense strategy, but rather that Jacobson and Crow were motivated by ulterior motives of fame and fortune, that they exploited Stano's psychological weaknesses and fed Stano facts in order to obtain confessions without regard to their truth. Thus, Stano alleges that he was convicted on the basis of confessions to the Scharf killing, the truth of which was thus tainted and that the state had knowledge of this, but failed to disclose this *Brady* material. While the state's version of the facts may well be borne out by the facts developed at the evidentiary hearing on remand, in the present posture of this case, we can only conclude that an evidentiary hearing is required.

sion and coercion constitute significant impeachment of Stano's confessions and would have substantially enhanced the defense strategy. Thus, we conclude that the first requirement—that the alleged facts be favorable to the defense—is clearly met.

With respect to whether or not the evidence of collusion was suppressed by the prosecution, we conclude that there are disputed facts which require an evidentiary hearing. Stano alleges that Crow was in charge of the investigation which produced the crucial confessions, and that Crow's knowledge of the collusion was police knowledge that should have been disclosed pursuant to *Brady*. If Crow was part of the prosecution team in the Scharf case, then the state is responsible for his knowledge. *United States v. Antone*, 603 F.2d 566 (5th Cir.1979).[26] In this regard, there are disputed issues of fact which require evidentiary development. On the one hand, Crow was a detective in a county other than the one in which the Scharf murder was prosecuted. On the other hand, there is evidence that Stano was committed to Crow's custody at the time of the three confessions, that access to Stano was limited to Crow at the time of two of the confessions, and that Crow was involved in and perhaps in charge of the Scharf investigation.

Turning to the materiality prong of the *Brady* analysis, we conclude that if all of Stano's allegations are true, there is a reasonable probability that the result of the guilt phase would have been different. We noted above that the suppressed evidence would have substantially strengthened the defense strategy at trial. If the March 6, 1981, and the August 11 and 12, 1982, confessions were coerced and subject to suppression as alleged, the linchpin of the prosecutor's case would have been removed. Even with these confessions, a previous jury had been unable to find Stano guilty, and thus a mistrial resulted. *See United States v. Agurs*, 427 U.S. 97, 112–13, 96 S.Ct. 2392, 2401–2402, 49 L.Ed.2d 342 (1976); *Carter v. Rafferty*, 826 F.2d 1299, 1308–09 (3d Cir.1987), *cert. denied*, 484 U.S. 1011, 108 S.Ct. 711, 98 L.Ed.2d 661 (1988) (assessment of the materiality of the suppressed evidence depends in part on the strength or fragility of the state's case as a whole). There was very little other evidence linking Stano to the crime. His jailhouse confession to Zacke was subject to forceful impeachment at trial;[27] and the Zacke confession may in any event have been in violation of *United States v. Henry*, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980) (*see infra*). The alleged misconduct reflected in the suppressed evidence would have been enthusiastically exploited by defense counsel,[28] would have fit the defense strategy like a glove, and would have provided forceful impeachment of the major evidence against Stano—i.e., the confessions to Crow and Manis. We conclude that the materiality prong has been satisfied.

The state argues that the result would not have been different because Stano testified at sentencing and confessed to the killing.[29] Even if we assume that Stano's

---

**26.** This case was decided prior to the close of business on September 30, 1981, and is binding precedent under *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981).

**27.** In its closing argument, the state noted that Zacke was a five-time felon and had received concessions from the government for his testimony. The state invited the jury to consider Zacke's testimony "in conjunction with other established facts. And if it matches up reasonably well, I believe you're allowed to infer that that person is being truthful." Advanced App. Vol. III, at 1073.

**28.** *See Bowen v. Maynard*, 799 F.2d 593, 613 (10th Cir.), *cert. denied*, 479 U.S. 962, 107 S.Ct. 458, 93 L.Ed.2d 404 (1986) ("The withheld evidence also raises serious questions about the manner, quality, and thoroughness of the investigation.... A common trial tactic of defense lawyers is to discredit the caliber of the investigation ... and we may consider such use in assessing the *Brady* violation."). In this case the materiality of the suppressed evidence far exceeds impeachment of investigative techniques and exceeds even mere misconduct. The alleged misconduct in this case undermines the reliability of the major evidence against Stano.

**29.** The state also argues that Stano's confession to Dr. Mussenden, a psychologist secured by Stano's trial attorney to assist in the defense, is relevant to the materiality prong. However, this evidence was not introduced either at the guilt phase or the sentencing phase of Stano's trial. The state could not have called Dr. Mus-

later testimony at sentencing is properly considered in determining whether there is a reasonable probability that the result of

the preceding guilt phase would have been different,[30] Stano's sentencing testimony was unequivocal that he did not kill Cathy Scharf.[31]

senden as its own witness at trial because any communications between Stano and Dr. Mussenden are protected by the attorney-client privilege. *Pouncy v. State,* 353 So.2d 640, 642 (Fla. App.1977). Moreover, under Florida's psychiatrist-patient privilege, any statement of this type is not admissible on the ultimate issue of guilt or innocence. Fla.Stat. § 90.503 (1979); *Parkin v. State,* 238 So.2d 817, 823 (Fla.1970); *McMunn v. State,* 264 So.2d 868, 870 (Fla.App.1972).

**30.** We decline to address at this stage the novel issue of whether or not it is appropriate to consider Stano's later sentencing testimony in deciding whether there is a reasonable probability that the result of the preceding guilt phase would have been different. Resolution of this issue may not be necessary in this case. *See infra,* note 31. If on remand it does become necessary to address this novel issue, the following sub-issues become relevant.

First, if on remand Stano's March 6, 1981, and August 11 and 12, 1982, confessions are found to have been coerced and suppressible, then the district court should consider whether Stano's sentencing testimony was induced by the former confessions and thus was fruit of the poisonous tree. *Harrison v. United States,* 392 U.S. 219, 88 S.Ct. 2008, 20 L.Ed.2d 1047 (1968); *Smith v. Estelle,* 527 F.2d 430 (5th Cir.1976). This sub-issue itself would require evidentiary development of the nexus between the early confessions and the sentencing testimony—i.e., whether the sentencing testimony was "induced" by the erroneous admission of the coerced confessions is itself a factual issue.

Second, if the district court determines on remand that *Harrison, supra,* is no bar to consideration of Stano's sentencing testimony, then an issue of first impression in this circuit becomes relevant, i.e., whether the district court in analyzing the *Brady* materiality prong should weigh the significance of the suppressed evidence in light of the existing trial record, or whether it is appropriate for the district court to consider new evidence that the state might have, but did not, adduce. *See Miller v. Angliker,* 848 F.2d 1312, 1323 (2d Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 224, 102 L.Ed.2d 214 (1988) ("We believe the state is not entitled to seek to minimize the materiality of the withheld information by arguing that it could have produced additional evidence at a fuller trial. Having avoided the need to make a full presentation by means of a plea agreement that immunized its presentation from attack, and having achieved the plea agreement only after withholding information that would have put teeth in the attack, the state could not be allowed to becloud the court's already hypothetical analysis of the likely effect of the withheld information by adverting other evidence it *might* have adduced had it

not procured the plea agreement."); *McDowell v. Dixon,* 858 F.2d 945, 950 (4th Cir.1988), *cert. denied,* — U.S. —, 109 S.Ct. 1172, 103 L.Ed.2d 230 (1989) (refusing to consider post-trial recantations of information found in suppressed material when making materiality determination); *Lindsey v. King,* 769 F.2d 1034, 1040, 1042 (5th Cir.1985) (giving no weight to prosecutor's claim that suppressed matter was not material because it was flawed by a typographical error). Although the above cases suggest that, in analyzing *Brady*'s materiality prong, it is not appropriate to consider new evidence that the state might have, but did not, adduce, there is somewhat inconsistent authority in the different context of ineffective assistance of counsel. In analyzing the analogous prejudice prong of ineffective assistance of counsel, both the Supreme Court and this court have considered related evidence that the government would likely have asserted to rebut evidence that a defense attorney was allegedly ineffective for failing to adduce. *Strickland v. Washington,* 466 U.S. 668, 701, 104 S.Ct. 2052, 2071, 80 L.Ed.2d 674 (1984); *Bertolotti v. Dugger,* 883 F.2d 1503, 1516–19 (11th Cir.1989). However, neither the Supreme Court nor this court has addressed the issue in the *Brady* context.

Third, assuming arguendo that it is appropriate to consider related evidence which the government was likely to assert in rebuttal—i.e., assuming arguendo that the approach of the ineffective assistance of counsel cases is applied in the *Brady* context—the state nevertheless faces a significant hurdle. The evidence at issue in this case does not fit neatly into the pattern developed in the ineffective assistance of counsel cases. Had the suppressed *Brady* evidence in this case been disclosed and introduced at the guilt phase, it is *not* likely that the state would have rebutted that evidence with Stano's sentencing testimony. Stano did not testify at the guilt phase and, obviously, the state had no way to require him to testify. On remand, the state will be free to suggest any other theory under which it would be appropriate to consider Stano's sentencing testimony in analyzing *Brady*'s materiality prong.

**31.** At sentencing, Stano repeatedly and unequivocally testified that he did not kill Cathy Scharf. However, he did admit that he had killed several specific young women and that he had pled guilty to those murders. Those convictions were introduced at sentencing. Stano also admitted that he had told Crow and Manis about murdering someone in the general manner they related, but he was unequivocal in his testimony that this individual was not Cathy Scharf, the victim of the crime for which he was on trial.

For the foregoing reasons, we conclude that Stano is entitled to an evidentiary hearing on his *Brady* claim.

## II. *HENRY* CLAIM

Stano alleges that the testimony of Zacke relating the jailhouse confession by Stano violates *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). He alleges that Moxley, who prosecuted both Stano and Zacke, promised leniency to Zacke in exchange for testimony about other murders.[32] He also alleges that the prosecutor directed that Zacke and Stano be placed in proximity to each other in the jail.[33] Stano argues that Zacke was thus an agent of the state who elicited statements from him in violation of *Henry.* The state asserts a procedural bar because of Stano's failure to assert the *Henry* claim during the 1986 proceedings in state court pursuant to Florida Rule of Criminal Procedure 3.850. Because an evidentiary hearing must take place on remand in any event, the interests of judicial economy indicate that the facts relevant to this claim, and any cause and prejudice to excuse the procedural default, be developed at the hearing, and that the claim as thus developed be addressed in the first instance by the district court.

The context of that statement was that Stano had heard all of the evidence at trial—e.g., he had seen the picture introduced at trial of Cathy Scharf with her long blonde hair; he had seen the rings that were recovered from Cathy Scharf's body, including the metal ring with the Indian head design. With such precise knowledge, Stano may well have been able to conclude with certainty that the young woman whom he had murdered was not Cathy Scharf. In fact, this sentencing testimony is consistent with Stano's taped confession in which he described the girl he confessed to killing as having darker hair, and in which he described her jewelry as being turquoise, both of which are at variance with Cathy Scharf's blonde hair and the Indian head ring found on her body. While the state argues that Stano's sentencing testimony was merely self-serving, in the present posture of this case in which no evidentiary hearing has been held, the most that can be said for the state's position is that there is a dispute of fact as to whether Stano's sentencing testimony could have any effect on *Brady*'s materiality analysis.

## III. OTHER CLAIMS

### 1. *Johnson v. Mississippi* Claim

After the proceedings in the district court in this case, two of the prior convictions which were relied upon by the state in the sentencing phase were found to be invalid by a panel of this court. *Stano v. Dugger,* 889 F.2d 962 (11th Cir.1989). For this reason, Stano argues that his sentence in this case must be vacated, citing *Johnson v. Mississippi,* 486 U.S. 578, 108 S.Ct. 1981, 100 L.Ed.2d 575 (1988).

On remand the district court shall address this argument in the first instance.

### 2. Ineffective Assistance of Counsel

■ a. Stano claims that his trial counsel, Russo and Friedland, were ineffective for failing to seek suppression of the several confessions to the Scharf killing and the confessions which formed the basis of the prior convictions introduced at sentencing. Russo and Friedland testified at the limited evidentiary hearing in district court that they did not know of the potential grounds for challenging the confessions that have now emerged—i.e., the alleged collusion between Jacobson, Dr. McMillan, and Crow which is the basis of the *Brady* claim; and the alleged agreement (i.e., agency) between Zacke and the prosecutor which forms the basis of the *Henry* claim.[34]

**32.** Petition at 275–76; Appendix 127 (April 15, 1983, statement of Zacke).

**33.** Petition at 276; Appendix 127 (Note in prosecution file re moving Zacke into Stano's cell).

**34.** In the state proceedings pursuant to Florida Rule of Criminal Procedure 3.850, Stano was offered a limited evidentiary hearing on ineffective assistance of counsel, but the offer was limited to the testimony of the two trial attorneys, Russo and Friedland. In the district court, such a limited evidentiary hearing was actually held; however, again, only Russo and Friedland were permitted to testify. Such a limited evidentiary hearing was clearly inadequate for the development of the facts relating to the collusion between Jacobson, McMillan, and Crow or for the development of facts relating to the agency of Zacke. However, the record as a whole (as indicated in the text) conclusively establishes that Russo and Friedland could not in the exercise of reasonable diligence have discovered the misconduct which

Upon careful consideration of the particularized and voluminous facts alleged in support of the *Brady* and *Henry* claims, together with the testimony of Russo and Friedland, we are satisfied that it was not reasonably possible for Russo and Friedland to have suspected the misconduct on the part of the state and previous defense counsel which forms the basis of the *Brady* and *Henry* claims. Accordingly, we affirm the judgment of the district court denying relief on the claim of ineffective assistance of counsel for failure to challenge the confessions.

b. Stano's other claims of ineffective assistance of counsel are without merit for the reasons set forth by Judge Fay in the panel opinion. We affirm the judgment of the district court denying relief with respect to these claims of ineffective assistance of counsel.

### 3. Evidentiary Claims

We agree with the panel and the district court that Stano's several evidentiary claims do not warrant relief. We affirm the judgment of the district court denying relief with respect to these evidentiary claims.

### 4. Remaining Claims

The remaining claims urged by Stano have no merit for the reasons set forth by Judge Fay in the panel opinion. We affirm the judgment of the district court denying relief with respect to these claims.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

EDMONDSON, Circuit Judge, concurring:

I concur in the judgment of the court, although I believe the case could have been easily decided otherwise. I write separately because I think this case will be back before us; and suggestions on our part might help the district judge and the parties to develop a complete record on the main issues.

forms the basis for the potential challenges to

This court remands for an evidentiary hearing on Stano's claim under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In particular, the district court needs to determine whether Detective Paul Crow was "part of the prosecution team in the Scharf case," and whether he can be said to have acted under the authority of Brevard County Prosecutor Dean Moxley. The police department for which Crow works is not in the same judicial circuit as the circuit in which Moxley is a prosecutor. There is no obvious reason in fact or law to suggest that Crow was under the authority of or otherwise answerable to Moxley.

In *Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972), the prosecutor failed to turn over a prior police statement of a government witness who testified at trial. The Supreme Court said "[w]e know of no constitutional requirement that the prosecution make a complete and detailed accounting of all police and investigatory work on a case." *Moore*, 408 U.S. at 795, 92 S.Ct. at 2568. In *United States v. Meros*, 866 F.2d 1304, 1309 (11th Cir.1989), we held that *Brady* applies only to information possessed by the prosecutor or by someone over whom he has authority. We also wrote in *United States v. Burroughs*, 830 F.2d 1574, 1579 n. 6 (11th Cir.1987), that the prosecution is not responsible for information known to a prosecution witness, but not in fact known to the prosecutor.

Accordingly, the district court needs to answer the following questions: (1) did the prosecutor (Moxley) who prosecuted Stano know of the collusion between Crow, Jacobson and McMillan; (2) did Crow in fact work for Moxley; (3) was Crow under the control or authority of Moxley; (4) did Crow have any significant role in developing the Scharf murder case for trial once he informed Manis of Stano's confession.

I doubt that every peace officer in Florida is a member of every Florida prosecutor's prosecution team. And I doubt that a police officer who testifies as a prosecution witness or simply cooperates with a prose-

the confessions.

cutor automatically becomes part of the prosecution team. If information actually unknown to a prosecutor is to be imputed to the prosecutor, I suspect that some element of control or supervision on behalf of the prosecution must exist so that the police officer is truly an agent of the prosecutor. To hold otherwise is not to follow *Brady,* but to extend it substantially. I need not work all of this out today; but at the evidentiary hearing in this case, I hope that the district court will establish a particularized factual predicate to allow the applicable law to be developed in the light of concrete facts instead of in a vacuum.

The language in *United States v. Antone,* 603 F.2d 566, 569–70 (5th Cir.1979), suggesting that a state police officer's knowledge may be imputable to a federal prosecutor, is dicta: relief was actually denied because the information supposedly withheld from the defendant was insufficiently important. Citation of *Antone* in today's court opinion does not change that. Even *Antone* stressed concepts involving intimate cooperation, jurisdictional overlap and pooling of investigative energies. 603 F.2d at 569–70. Thus, in addition to applying the term in this case, we must define the scope of the term "prosecution team" as a matter of law.

We also remand for further consideration on Stano's claim under *United States v. Henry,* 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980). On remand, I hope the attention of the lawyers and district court will focus on some specific points for factual development. In *Henry,* Henry was an inmate who told his incriminating story to Nichols, another inmate. The Supreme Court described the case as one where Henry was "in the company of a fellow inmate who [was] acting by prearrangement as a government agent." *Henry,* 447 U.S. at 273, 100 S.Ct. at 2188. The main points are "prearrangement" and "government agent".

In *Lightbourne v. Dugger,* 829 F.2d 1012, 1020 (11th Cir.1987), we said: "we should keep in mind the duty that is imposed upon all citizens to report criminal activity to the appropriate authorities."

The Supreme Court has said "[t]his deeply rooted social obligation is not diminished when the witness to crime is involved in illicit activities himself, ... the criminal defendant no less than any other citizen is obliged to assist the authorities." *Roberts v. United States,* 445 U.S. 552, 558, 100 S.Ct. 1358, 1363, 63 L.Ed.2d 622 (1980).

The essence of the *Massiah v. United States,* 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), and *Henry* line of cases is to discourage secret interrogations that are in fact the "equivalent of direct police interrogation." *Kuhlmann v. Wilson,* 477 U.S. 436, 106 S.Ct. 2616, 91 L.Ed.2d 364 (1986); *Lightbourne,* 829 F.2d at 1020–21. In *Henry,* the Supreme Court stressed that the FBI singled out Henry as someone in whom they had an interest.

There is no allegation in this petition that Zacke received instructions from the police or from prosecutors to do anything about Stano—even to listen passively. The strongest allegation in the petition is that there is a note in the prosecutor's file indicating that Zacke, the informant, was to be placed in the same cell with Stano; but this apparently never occurred. Such allegation, even if true, does not, as I understand it, support a finding of a *Henry* violation. The Supreme Court has said in *Kuhlmann,* "a defendant does not make out a violation of [the sixth amendment] right simply by showing that an informant, either through prior arrangement or voluntarily, reported his incriminating statements to the police." 477 U.S. at 459, 106 S.Ct. at 2630.

A proper application of *Henry* must reflect the general obligation of all citizens, including incarcerated citizens, to assist the police. *Henry* and *Massiah* show how very narrow is the exception to the general rule that all information brought to the police is usable. Time and time again, in cases such as *Lightbourne* (inmate's motives alone cannot make him police agent) and *Harker v. State of Maryland,* 800 F.2d 437 (4th Cir.1986) (prison informant was not government agent where he was not paid or acting under instruction or solicitation of government if he responds to general request for information), courts have

**908**

stressed the difference between being a government agent and a government informant. *See, e.g., Alexander v. Connecticut,* 876 F.2d 277 (2d Cir.1989); *Brooks v. Kincheloe,* 848 F.2d 940 (9th Cir.1988); *United States v. Taylor,* 800 F.2d 1012 (10th Cir.1986); *United States v. Calder,* 641 F.2d 76 (2d Cir.1981).

The use of inmate informants is generally constitutionally permissible even if they actively elicit information and even if they do so in the belief that they will be rewarded by the government for collecting information. I think the sole exception may be where there has been a presolicitation of an informant by the government, focusing on another particular inmate as the target and with compensation agreed to in advance, so that the informing inmate is acting just as if he were a police officer interrogating the inmate.

*Henry* seems narrow and can and ought to be confined to its facts. So, I hope the parties will develop in detail the facts, including (1) what, if anything, Zacke was told by state officers to do about Stano in particular and when and by whom he was told to do it; (2) what was the subject and scope of the agreement Zacke and Moxley reached in April 1983 about Zacke's assistance when Zacke definitely agreed to assist in regard to the prosecution of the killers of Mr. Hunt; and (3) did Zacke "deliberately elicit" incriminating statements from Stano.

FAY, Circuit Judge, dissenting:

Gerald Stano has confessed to murdering a large number of young ladies. This case involves the murder of Cathy Scharf. Unlike Stano's other cases, he went to trial in this one. He was convicted and sentenced to death. That judgment was affirmed by the state appellate courts and the United States Supreme Court denied certiorari. In this habeas action, Stano raised a large number of issues. The district court entered a lengthy detailed order denying relief. A panel of this court reviewed the multiple issues presented on appeal and affirmed the denial. Judge Anderson filed

a partial dissent. The case was taken for *en banc* review.

A majority of the *en banc* court feels there should be an evidentiary hearing on the *Brady* and *Henry* claims. Nothing presented throughout the lengthy consideration of this matter has convinced me that such is warranted by either the alleged facts or existing precedent. Most respectfully, I dissent for the reasons set forth in the majority opinion found at 883 F.2d 900.