[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 965 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 966 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 967 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 968 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 969 
Arthur Lee Giles, an inmate incarcerated on death-row at the Holman Correctional Facility, appeals the denial of his petition for postconviction relief filed pursuant to Rule 32, Ala.R.Crim.P. In 1979, Giles was convicted of murdering Carl Nelson and Willene Nelson during the course of a robbery.[1] Giles was charged, convicted, and sentenced under the previous death-penalty statute, § 13-11-2(a)(10), Ala. Code 1975 (repealed and replaced by § 13A-5-40(a)(10)) — killing two or more people during one course of conduct. The circuit court found three aggravating circumstances — that Giles created a great risk of death to many persons, that the murders occurred during a robbery, and that the murders were especially heinous, atrocious, or cruel when compared to other capital murders. On direct appeal, this Court reversed Giles's conviction based on the United States Supreme Court's decision in Beck v.Alabama, 447 U.S. 625, 100 S.Ct. 2382, 65 L.Ed.2d 392 (1980). See Giles v. State, 405 So.2d 50 (Ala.Crim.App. 1981).
In 1982, Giles was again convicted of capital murder and was sentenced to death. His conviction was affirmed; however, the Alabama Supreme Court set aside his sentence of death and ordered a new sentencing hearing. See Giles v. State, 554 So.2d 1073
(Ala.Crim.App. 1984), rev'd in part, 554 So.2d 1089 (Ala. 1987).
In 1991, venue was changed and a jury was empaneled in Morgan County to conduct a new sentencing hearing. The jury was unable to reach an unanimous verdict — 11 voted for the death penalty and 1 voted for life imprisonment without parole. Under the former death-penalty statute all 12 jurors had to agree in order to return a death recommendation; therefore, the jury recommended a sentence of life imprisonment without the possibility of parole.[2] Thereafter, as required by the law at the time of the murders the circuit court considered the jury's recommendation of life imprisonment without the possibility of parole; it overrode the jury's recommendation and sentenced Giles to death. His death sentence was affirmed on appeal. *Page 970 
See Giles v. State, 632 So.2d 568 (Ala.Crim.App. 1992), aff'd,632 So.2d 577 (Ala. 1993). Pursuant to Rule 41, Ala.R.App.P., we issued the certificate of judgment for Giles's direct appeal on February 3, 1994.
In February 1996, Giles filed a petition for postconviction relief in the Blount Circuit Court. In February 1998, he filed an amended petition. In August 1998, the circuit court issued an order dismissing those claims it found were precluded. On August 24, 1998, and on November 2, 1998, evidentiary hearings were held. On October 23, 1998, Giles filed a second amended petition. On August 14, 2000, the circuit court denied Giles's Rule 32 petition in a thorough 138-page order. A third amended petition was received in the circuit court on August 14, 2000. This appeal followed.
The facts underlying Giles's capital-murder conviction are set out in great detail in this Court's previous opinions in this case. See Giles v. State, 440 So.2d 1237 (Ala.Crim.App. 1983), and Jones v. State, 520 So.2d 543 (Ala.Crim.App. 1984). In Giles's appeal from his second capital-murder conviction, we stated:
 "The appellant and his accomplice, Aaron Jones, traveled to the home of Willene and Carl Nelson in the early morning hours of November 10, 1978, with the intention of robbing the Nelsons. While at the Nelsons' home, the appellant and Jones, in concert, shot or stabbed all six occupants: Carl and Willene Nelson; their three children, Tony, Brenda and Charlie; and Carl's mother, Annie M. Nelson. When the appellant and Jones left, Carl and Willene Nelson were dead and the other four victims were seriously wounded. It is undisputed that the appellant did all of the shooting, including the shooting of Willene and Carl. In his confession, after admitting the shooting, the appellant explained that all of the victims were alive when he finished shooting. He further explained that Jones entered the room after the shooting was completed and suggested that they stab the victims to eliminate any witnesses and that Jones went to the kitchen and retrieved a butcher knife, with which Jones completed the bloody massacre.¹ Therefore, the only material factual distinctions between the prosecution's theory and the appellant's theory in defense involve appellant's intent and the question of who actually inflicted the fatal blows to both Willene and Carl Nelson.
 ¹ "Appellant's version of the stabbing was in sharp conflict with Jones's confession, in which Jones stated that appellant had the knife and had already stabbed some of the victims before Jones stabbed anyone. See, Jones v. State, [520 So.2d 543
(Ala.Crim.App. 1984)]."
554 So.2d at 1076.
 Standard of Review
We do not apply a plain-error standard of review when evaluating a circuit court's ruling denying a Rule 32 petition in a capital case. See Hill v. State, 695 So.2d 1223
(Ala.Crim.App. 1997). "If the circuit court is correct for any reason, even though it may not be the stated reason, we will not reverse its denial of the petition." Reed v. State,748 So.2d 231, 233 (Ala.Crim.App. 1999). We will reverse a circuit court's findings only if they are "clearly erroneous." Jenkins v.State, [Ms. CR-97-0864, February 27, 2004] ___ So.2d ___ (Ala.Crim.App. 2004); Slaton v. State, 902 So.2d 102
(Ala.Crim.App. 2003).
 "`"[A] finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and *Page 971 
firm conviction that a mistake has been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). . . . If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150 (1949); see also Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).' Id., 470 U.S. at 573-74, 105 S.Ct. at 1511."
Morrison v. State, 551 So.2d 435, 436-37 (Ala.Crim.App. 1989), quoting Anderson v. City of Bessemer City, N.C., 470 U.S. 564,572, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
Giles filed this action in the circuit court. According to Rule 32.3, Ala.R.Crim.P., he has the "burden of pleading and proving by a preponderance of the evidence the facts necessary to entitle the petitioner to relief." The procedural default grounds contained in Rule 32 apply equally to all cases, even those involving the death penalty. See DeBruce v. State,890 So.2d 1068 (Ala.Crim.App. 2003); Hamm v. State, [Ms. CR-99-0654, February 1, 2002] ___ So.2d ___ (Ala.Crim.App. 2002); Wright v.State, 766 So.2d 213 (Ala.Crim.App. 2000).
In order to clarify the record, we note that the original postconviction petition was stamped filed in the circuit clerk's office on a date past the expiration of the limitations period provided by Rule 32.2(c), Ala.R.Crim.P. We issued the certificate of judgment for Giles's direct appeal on February 3, 1994. According to Rule 32.2(c), Ala.R.Crim.P., as it read at the time that the Rule 32 petition was filed, Giles had two years from the date of the issuance of the certificate of judgment to file a Rule 32 petition.[3] The petition was stamped filed on February 6, 1996, but was due to be filed by February 3, 1996, to be timely.[4] However, attached to the Rule 32 petition is an affidavit executed by an intern with the Equal Justice Initiative of Alabama ("EJI"). The affidavit states that the intern attempted to hand-deliver a copy of the petition to the Blount Circuit Court on Friday, February 2, 1996, and again on Monday, February 5, 1996, but the courthouse was closed because of severe weather conditions. This fact is not disputed in the record. Rule 1.3(a), Ala.R.Crim.P., states in part:
 "The last day of the period so computed shall be included, unless that day is a Saturday, Sunday, legal holiday, or day on which the appropriate clerk's office is closed pursuant to Rule 5(B) or (C), Alabama Rules of Judicial Administration (A.R.J.A.), in which case the period shall run until the end of the next day which is not a Saturday, Sunday, or a legal holiday, or a day on which the clerk's office is closed pursuant to Rule 5(B) or (C), A.R.J.A." *Page 972 
Rule 5(C), Ala.R.Jud.Admin., specifically addresses the closing of a circuit clerk's office because of severe weather conditions. Accordingly, Giles's Rule 32 petition was timely filed.
Two amended petitions were filed in this case. Both were filed outside the limitations period of Rule 32.2(c), Ala.R.Crim.P. However, the issues raised in those petitions would be considered timely if they related back to a claim asserted in the original Rule 32 petition. Charest v. State, 854 So.2d 1102
(Ala.Crim.App. 2002). The limitations period contained in Rule 32.2(c), Ala.R.Crim.P., is jurisdictional and deprives a court of considering any issue other than one challenging jurisdiction.Williams v. State, 783 So.2d 135 (Ala.Crim.App. 2000).
Last, there is a discrepancy as to when the third amended petition was deemed "filed" in the circuit clerk's office. After the certified record was filed with this Court, Giles noticed that the record did not include a copy of the third amended petition. Giles filed a motion under Rule 10(g), Ala.R.App.P., to supplement the record to include this petition. The circuit court held an evidentiary hearing. Apparently, the third amended petition was not sent directly to the circuit clerk's office but was addressed to the circuit judge and was delivered and was signed for by an employee of the district court clerk's office. It was stipulated that the box containing the amended petition was delivered to the courthouse on August 14, 2000. The box was discovered unopened in the circuit judge's office on April 18, 2001, near the time of the hearing on the motion to supplement the record. The circuit court's order denying relief was stamped filed in the circuit clerk's office on August 14, 2000. Rule 32.7(b), Ala.R.Crim.P., states: "Amendments to pleadings may be permitted at any stage of the proceedings prior to the entry ofjudgment." (Emphasis added.)
Giles argues that he should be given the benefit of the date that he signed the certificate of service on the third amended petition — August 11, 2000. That is not the law. As stated inMoutry v. State, 359 So.2d 388, 389-90 (Ala.Civ.App. 1978):
 "Whereas, service of papers is complete upon mailing, filing is not complete until the notice is delivered to the proper filing officer. . . .
 "Put another way, the so-called `mailbox rule,' as applied to contracts or service of papers, is not applicable in the context of a `filing' requirement. A document has not been filed until it has actually been received by the court; mere mailing is not enough."
Compare Rule 25(a), Ala.R.App.P., which applies only to appellate court filings and allows a party to claim the benefit of a mailing date when the document is sent via United States Postal Service certified or registered mail.[5] See also Rule 4(c), Ala.R.App.P., which allows an incarcerated inmate *Page 973 
the benefit of the mailing date when filing a notice of appeal.
Accordingly, the third amended petition was "filed" on the date it was received — the same date that the circuit court's order denying relief was stamped filed in the circuit clerk's office — August 14, 2000.[6] The third amended petition was not filed before the entry of judgment. Therefore, we will not consider the allegations contained in that petition because they were never properly before the circuit court. See Allen v.State, 825 So.2d 264 (Ala.Crim.App. 2001), aff'd, 825 So.2d 271
(Ala. 2002).[7]
 I.
Giles argues that the circuit court erred in dismissing hisBrady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215
(1963), claims. He cites several different grounds in support of this contention.
Initially, we note that there were no Brady allegations contained in the timely filed Rule 32 petition. Therefore, all the Brady claims were raised after the expiration of the limitations period contained in Rule 32.2(c), Ala.R.Crim.P. ABrady claim is subject to the procedural default grounds contained in Rule 32, Ala.R.Crim.P.[8] However, the claims would be considered timely if they related back to any claims raised in the timely petition. Charest, supra. The claims did not.
Moreover, the Brady claims were correctly denied by the circuit court.
 "In Brady [v. Maryland], 373 U.S. [83,] 87, 83 S.Ct. [1194] 1196-97 [10 L.Ed.2d 215] [(1963)], the Supreme Court held that `the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution.' A Brady violation occurs where: (1) the prosecution suppresses evidence; (2) the evidence is favorable to the defendant and (3) material to the issues at trial. Stano v. Dugger, 901 F.2d 898, 899 (11th Cir. 1990); Delap v. Dugger, 890 F.2d 285
(11th Cir. 1989); United States v. Blasco, 702 F.2d 1315, 1327 (11th Cir.), cert. denied, 464 U.S. 914, 104 S.Ct. 275, 276, 78 L.Ed.2d 256 (1983); Ex parte Kennedy, 472 So.2d 1106, 1110 (Ala.), cert. denied, 474 U.S. 975, 106 S.Ct. 340, 88 L.Ed.2d 325
(1985). The Supreme Court of the United States in United States v. Bagley, 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985) (plurality opinion by Blackmun, J.), defined the standard of materiality required to show a Brady violation as follows: `The evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' See also Pennsylvania v. Ritchie, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 40
(1987); Stano v. Dugger, 901 F.2d at 899; Delap v. *Page 974 Dugger, 890 F.2d at 299; Coral v. State, 628 So.2d 954 (Ala.Cr.App. 1992); Thompson v. State, 581 So.2d 1216 (Ala.Cr.App. 1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992).
 "The same standard of materiality and due process requirements apply whether the evidence is exculpatory or for impeachment purposes. United States v. Bagley; Giglio v. United States, 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); Ex parte Womack [, 435 So.2d 766 (Ala. 1983)]. `When the "reliability of a given witness may well be determinative of guilt or innocence," nondisclosure of evidence affecting credibility falls within the general rule.' Giglio, 405 U.S. at 154, 92 S.Ct. at 766 (quoting Napue v. Illinois, 360 U.S. 264, 269, 79 S.Ct. 1173, 1177, 3 L.Ed.2d 1217 (1959)). In short, due process requires the prosecution to disclose material evidence, upon request by the defense, when that evidence would tend to exculpate the accused or to impeach the veracity of a critical state's witness."
Williams v. State, 710 So.2d 1276, 1296-97 (Ala.Crim.App. 1996).
 A.
Giles first argues that the prosecution suppressed exculpatory evidence of a motion filed in an unrelated case involving one of the victims, Carl Nelson, to discover the identity of the "anonymous informer" involved in Nelson's arrest for a controlled-substance violation. Giles argues that this motion was critical to his capital-murder case because, he says, it would tend to establish a connection between Nelson's prosecution for a drug offense and the murders. Giles implied in the postconviction proceedings that the murders were drug-related and that Giles was the anonymous informer.[9]
The circuit court made the following findings of fact in regard to this issue:
 "In discovery in these proceedings, the defense obtained from the prosecution files a motion to disclose the identity of an unidentified informant filed in another prosecution. The other prosecution was against Carl Nelson for possession of marijuana. The motion was apparently filed on Carl Nelson's behalf. On its face, this motion was part of a public record filed in the district court of Blount County and as such was available to both the defense and the prosecution. In addition, the fact that a prosecution was brought against Nelson and dismissed was known to defense counsel, at least at the 1991 sentence hearing. In that hearing, defense counsel brought out through Billy Irvin, a prosecution witness, that Nelson had been charged criminally concerning a large amount of marijuana growing on his property and that case had been dismissed. Defense counsel then asked the witness if he knew the charges were dismissed because of a bad search warrant, but the witness did not know the answer. In addition, Giles failed to prove how this information was material or could have affected the outcome of the trial. Giles gave a full confession. He admitted that he went to the Nelson's home, after an absence of two years, to rob them. He admitted that he went into the home, uninvited at 3:00 a.m. when the family was sleeping and woke up family members. He admitted that, upon being instructed to leave the residence, he did so, only to return with a gun and begin shooting the family members.
 "While, during these proceedings, Giles did present some hearsay evidence *Page 975 
that he had been involved in drug dealings with Carl Nelson, he presented no evidence to support a theory that these murders were related to any such dealings or were in any way related to a Carl Nelson drug prosecution. By his own admission, Giles was at the Nelson home to commit a robbery. There is no evidence that there was any other motive for the murders or that Giles acted in self-defense. He was reentering the Nelson home with a loaded gun in his hand, after being told to leave, when he began the shooting spree that resulted in the deaths of Carl and Willene Nelson, the maiming of Brenda Nelson, and the wounding of Charlie Nelson, Tony Nelson, and Anne Nelson. The Brady claim as to the motion to disclose the identity of an unidentified informant in the Carl Nelson drug case is denied. The motion was neither suppressed by the State nor material to the defense."
(Supplemental record p. 37-39.)
The circuit court's conclusions are supported by caselaw. It appears that the defense was aware that Carl Nelson had been arrested for a controlled substance violation.[10] The defense had access to the records of Nelson's case and could have obtained a copy of anything in the court file. Also, if Giles was the anonymous informer, this information was certainly known to Giles. As we have stated:
 "`There is no Brady violation where the information in question could have been obtained by the defense through its own efforts.' Johnson [v. State], 612 So.2d [1288] at 1294 [(Ala.Crim.App. 1992)]; see also Jackson v. State, 674 So.2d 1318 (Ala.Cr.App. 1993), aff'd in part and rev'd in part on other grounds, 674 So.2d 1365 (Ala. 1995). `"Evidence is not `suppressed' if the defendant either knew . . . or should have known . . . of the essential facts permitting him to take advantage of any exculpatory evidence." United States v. LeRoy, 687 F.2d 610, 618 (2d Cir. 1982)[, cert. denied, 459 U.S. 1174, 103 S.Ct. 823, 74 L.Ed.2d 1019 (1983)].' Carr v. State, 505 So.2d 1294, 1297 (Ala.Cr.App. 1987) (noting, `The statement the appellant contends was suppressed in this case was his own, and no reason was set forth to explain why he should not have been aware of it.'). Where there is no suppression of evidence, there is no Brady violation. Carr, 505 So.2d at 1297."
Freeman v. State, 722 So.2d 806, 810-11 (Ala.Crim.App. 1998). There was no Brady violation. See Parris v. State,885 So.2d 813, 825 (Ala.Crim.App. 2002).
 B.
Giles argues that the circuit court erred in denying him relief on his claim that the State suppressed witnesses statements to the effect that Giles did not stab Willene Nelson. He argues in his brief to this Court that there was no evidence indicating that he actually stabbed anyone; therefore, his culpability in the murders was not as great as that of his codefendant's — Aaron Jones.
Seldom is there a capital-murder case where you have more direct evidence against an accused than what was presented at Giles's trials. Four members of the Nelson family testified at Giles's second trial. Tony Nelson, who was 20 years old at the time of the murders, testified that Giles and Jones came into his family's house early in the morning of November 10, 1978. He knew Giles, he said, because he had worked with his father on his father's farm. He testified that his father told the two to leave and they walked out the back door. He said that as he was *Page 976 
standing by the back door after they had left the house he was shot in the head and chest. Tony testified that Giles then went into the house and he heard gunshots. Anne Nelson, Carl Nelson's 86-year-old mother, testified that Giles and Jones entered the house and Giles shot her in the face and then went to her son's room and shot him twice. Brenda Nelson, who was 13 years old at the time of the murders, testified that Giles stabbed her mother and stabbed her in the back and that when Jones came into the bedroom where she was with her mother and father Jones also stabbed her mother and her brother Charlie.[11] Charlie Nelson, who was 10 years old at the time of the murders, testified that Giles had a gun and Jones had a knife. He said that Giles told Jones, "Kill them" and that Jones stabbed his mother repeatedly and then stabbed his father. The coroner testified that Willene Nelson died from multiple stab wounds and a gunshot wound and that Carl Nelson died from two gunshot wounds — one of which entered his heart — and stab wounds to his throat and abdomen.
Giles confessed to participating in the murders. His confession was introduced into evidence at both of his trials. He said that he did shoot the Nelsons but that he did not stab any of them. Giles said that Jones stabbed all of the victims. However, in Jones's confession, which was entered into evidence at Jones's trial, Jones stated that Giles had already stabbed some of the victims before he handed the knife to Jones. This statement was consistent with Brenda Nelson's testimony that both Giles and Jones stabbed her mother.
Giles argues that the circuit court erred in finding that comments contained in an investigator's notes about an interview with Brenda Nelson did not constitute exculpatory evidence. He asserts that the note contained a reference that Brenda Nelson told the investigator that Jones stabbed Willene Nelson to death.
The circuit court made the following findings:
 "Giles also claims that he was denied Brady
material because the State did not turn over to the defense a handwritten note found in the prosecution files during discovery in this proceeding. He claims that note, `Interview with Brenda Nelson 4/14/79,' contained a statement useful to the defense and the statement was not turned over to defense counsel. Giles claims this statement exonerates him from the murder of Willene Nelson. The statement is ambiguous, is not inconsistent with Brenda's testimony, and does not exonerate Giles. Even if read to be inconsistent with Brenda's testimony that Giles, not Jones, killed Willene Nelson, the statement, when considered with the rest of the evidence, does not diminish Giles's criminal culpability for the deaths of both Carl and Willene Nelson. [Defense counsel] recalled that he did know that Charlie remembered that Jones, not Giles, stabbed Willene Nelson. [Defense counsel] also recognized that, regarding the double murder aggravator, it did not really matter who did the stabbing if Giles was either wielding the knife himself or ordering that the killing be done. [Defense counsel] recognized the law in Alabama that an accessory to a crime is equally liable with his principal. This state does not distinguish between the liability of an accessory and a principal participating in a crime. Ala. Code § 13A-2-23 (1975); Ritter v. State, 375 So.2d 270 *Page 977 
(Ala. 1979) (a non-triggerman can be convicted of a capital offense if he was a knowing accomplice to the intentional killing itself.); and Ex parte Raines, 429 So.2d 1111, 1112 (Ala. 1982), cert. denied, 460 U.S. 1103, 103 S.Ct. 1804, 76 L.Ed.2d 368 (1983). `[T]he accomplice liability doctrine may be used to convict a non-triggerman accomplice, if, but only if, the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the underlying felony.'
 "Giles alleges in his second amendment to the petition that the note contained the following statement:
 "[Giles] went back out and got the other fellow and he came in and stabbed my mother to death and stabbed me twice in the back and my brother twice in the back and left."
 "(Second Amendment to the Petition at p. 6) In fact, that note . . . was as follows:
 "Went to bed about 9:30
 "Slept her mama
 "Daddy in the other bed in the same room
 "Charlie and Tony slept together in another room
 "She heard Tony and Giles talking
 "Her daddy went in there
 "He told the Lee guy to leave
 "Lee went outside
 "We went back to bed
 "Lee came back in and shot Tony
 "He came in our bedroom and shot my daddy, shot my mama and shot me.
 "He went back out and got a butcher knife and stabbed my mama almost to death — went back out and got the other fellow and he came in and stabbed mother to death and stabbed me twice in the back and my brother twice in the back and left.
 "I just laid down and played like I was dead.
 "After they left, Tony came back in and we went to the hospital.
 "(Emphasis added.) The Court reads these notes to be the recounting by unknown person who wrote them, apparently six months after the murders, that `Lee' (Giles) shot Carl Nelson, shot Willene Nelson, and shot Brenda. That person (Giles) then got a butcher knife and stabbed Willene Nelson `almost to death.' That person then, `went back out and got the other fellow and he (Giles or Jones?) stabbed mother to death and stabbed me twice in the back and my brother twice in the back and left.' It thus appears that the note-taker is writing that, according to Brenda, both Giles and `the other fellow' stabbed Willene Nelson. The State pathologist, who did the autopsy on Willene testified at the first trial that Willene Nelson died from a `gunshot wound and multiple stab wounds.' It is, therefore, clear that both types of wounds contributed to her death. In addition, for purposes of criminal liability, it does not matter which one of the codefendants killed Mrs. Nelson. Both actively participated in the events that caused her death. There is evidence that both participants intended to kill the victims. The claim concerning this statement is, therefore, denied."
(Supplemental record, p. 41-44, emphasis in original.)
A review of the investigator's notes as quoted above fails to support Giles's rendition of the facts. The note does not state that Brenda Nelson told the investigator that Jones stabbed Willene Nelson to death. Brenda Nelson testified *Page 978 
that both Giles and Jones stabbed her mother. Her testimony appears to be consistent with the investigator's notes. The circuit court correctly denied relief on this ground.
Moreover, though Brenda and Charlie Nelson's statements appeared to differ as to whether Giles had stabbed Willene Nelson, both statements were consistent concerning Giles's active participation in the murders. Neither statement would exonerate Giles. Under Alabama law an accessory may be charged and convicted as a principal. See § 13A-12-23, Ala. Code 1975.
Last, it appears from reading Brenda and Charlie's trial testimony that their statements about who stabbed their mother were not inconsistent. Brenda testified that she was in the bedroom with her parents before Charlie entered the room. She said that Giles stabbed her mother first. Charlie entered the room after Jones had entered and Charlie said that Jones stabbed his mother. A careful review of the record fails to show any conflict. There was no Brady violation here.
 C.
Giles argues that the State suppressed the grand jury testimony of Investigator Tom Ed Dickie. Specifically, he asserts that Dickie testified before the grand jury that when Giles was given his Miranda[12] warnings the second time he indicated that he did not wish to make a statement at that time. He asserts that this information showed that Giles invoked his right to remain silent — evidence that was relevant at the suppression hearing.
The circuit court stated the following about this issue:
 "Exhibit 5 is a transcript of the grand jury testimony of Investigator Tom Ed Dickie. That portion of exhibit 5 which Giles claims includes a violation of Brady is Dickie's testimony that, after the Miranda warning given Giles at the car, Giles `didn't wish to give a statement at that time.' This information was known to the defense at the Motion to Suppress hearing prior to Giles's first trial. At that hearing, Fred Allcorn testified that, when Giles was taken to the car to be transported from the place of his arrest, Giles was Mirandized and did not say anything but did indicate that he understood his rights. In any event, the statement does not constitute Brady material because it does not and would not lead to any different result in this case, either on the motion to suppress, discussed above, or any other issues in this trial."
(Supplemental record, p. 47.) This information was not suppressed. This evidence was introduced at Giles's first and second trials during the suppression hearings.
The evidence showed that Giles never invoked his right to counsel and that he initiated contact with police and was read and waived his Miranda rights. Dickie's grand jury testimony was not inconsistent with the evidence presented at trial and would have had no effect on the admissibility of Giles's confession.
The remaining Brady allegations that Giles raises in his brief to this Court were raised in the third amended petition. As stated previously, the third amended petition was not filed before the judgment was entered and was properly not considered by the circuit court. Therefore, we decline to examine any of those claims as those claims are not properly before this Court. *Page 979 
 II.
Giles argues that the circuit court erred in finding that all of his juror-related claims regarding his 1991 sentencing hearing were due to be dismissed.
When addressing this issue in its order, the circuit court stated:
 "The remainder of Giles's claims in his first and second amendments to the petition address issues about Giles's 1991 sentencing hearing. All of these claims were dismissed by this Court on August 22, 1998, for the reason, inter alia, they were raised and addressed on direct appeal and are thus barred from review in this proceeding pursuant to Rule 32.2(a)(4). It is unnecessary to treat those issues again here. Also, insofar as those issues pertain to the sentencing hearing conducted before the jury in Morgan County, Alabama, in 1991, trial counsel were successful in obtaining a life without parole recommendation from the jury. Giles was, therefore, not prejudiced by any juror-related errors.
 "Our state appellate courts have repeatedly held that, where a defendant wins a capital case sentencing phase before the jury and the jury enters a recommendation of life without parole, the defendant is not prejudiced by any errors which occurred concerning jury selection, prosecutorial argument, etc. See, e.g., Ferguson v. State, 814 So.2d 925, 948 (Ala.Crim.App. 2000); Taylor v. State, 808 So.2d 1148, 1211 (Ala.Crim.App. 2000); Roberts v. State, 735 So.2d 1244, 1255
(Ala.Crim.App. 1997), aff'd, 735 So.2d 1270 (Ala.), cert. denied, 528 U.S. 939, 120 S.Ct. 346, 145 L.Ed.2d 271 (1999) (`[E]ven if any error had occurred, it would have been harmless, because the jury recommended that Roberts be sentenced to life imprisonment without parole'); Giles v. State, 632 So.2d 568, 574 (Ala.Crim.App. 1992), aff'd, 632 So.2d 577 (Ala. 1993), cert. denied, 512 U.S. 1213, 114 S.Ct. 2694, 129 L.Ed.2d 825 (1994); Hooks v. State, 534 So.2d 329, 358 (Ala.Crim.App. 1987), aff'd, 534 So.2d 371 (Ala. 1988), cert. denied, 488 U.S. 1050, 109 S.Ct. 883, 102 L.Ed.2d 1005 (1989). . . . Giles won the jury sentencing stage of his trial; the jury recommended a sentence of life without parole. Giles, therefore, suffered no prejudice due to any of these alleged errors."
(Supplemental record, p. 140-41.)
The circuit court cites well-established caselaw that holds that error in a jury sentencing hearing in a capital case is harmless when the jury returns a recommendation of life imprisonment without parole — the more lenient of the two available sentences for a capital conviction. In fact this Court quoted this principle in Giles v. State, 632 So.2d 568, 574
(Ala.Crim.App. 1992). Accordingly, because any error was harmless, Giles cannot show that he suffered any prejudice. The circuit court's order denying relief on these claims is consistent with the law — it is not clearly erroneous. Giles,632 So.2d at 574.
Moreover, Giles specifically argues that he is entitled to a new trial because one of the juror's at his 1991 sentencing hearing was not qualified to serve as a juror in Alabama because he had been convicted of a felony and had had his civil rights revoked. Giles appears to argue that this juror's service on the venire tainted the verdict.
We have examined the record of Giles's 1991 sentencing hearing.[13] The juror that Giles's challenges in this postconviction *Page 980 
proceeding did not sit on Giles's jury. The record shows that this juror was questioned during voir dire examination and candidly admitted that he had previously been convicted of a felony and that he was on probation for that offense. However, the record fails to show whether this juror was ultimately excused by the circuit court for that reason or whether this juror was struck by use of a peremptory strike. The record does contain a strike list; however, the list does not correspond to the names of the jurors involved in Giles's 1991 case. All we do know from examining the record is that this juror did not serve on Giles's jury.
Section 12-16-60, Ala. Code 1975, contains the qualifications for jury service in Alabama. Section 12-16-60, states, in part:
 "(a) A prospective juror is qualified to serve on a jury if the juror is generally reputed to be honest and intelligent and is esteemed in the community for integrity, good character and sound judgment and also:
 ". . . .
 "(4) Has not lost the right to vote by conviction for any offense involving moral turpitude."
The lack of a qualification in § 12-16-60 is a valid ground to strike a juror for cause. Poole v. State, 497 So.2d 537 (Ala. 1986). The Alabama Supreme Court has held that the failure to remove a juror for cause is harmless when that juror is removed by the use of a peremptory strike. Bethea v. Springhill Mem'lHosp., 833 So.2d 1 (Ala. 2002).
Last, this issue does not raise a jurisdictional defect that would void the proceedings in the circuit court. As the Alabama Supreme Court stated in Ex parte Toyota Motor Corp.,684 So.2d 132 (Ala. 1996):
 "Under Alabama law, a `[f]ailure to timely challenge a juror for cause may result in a waiver of the right to do so if the fact of disqualification is either known or, through the exercise of due diligence, should be known.' Watters v. Lawrence County, 551 So.2d 1011, 1016 (Ala. 1989) (citing Williams v. Dan River Mills, Inc., 286 Ala. 703, 246 So.2d 431
(1971))."
684 So.2d at 136 (footnote omitted). A jurisdictional error cannot be waived. "`Nonjurisdictional issues can be waived; jurisdictional issues cannot.'" Baker v. State, 819 So.2d 87,89 (Ala.Crim.App. 2001), quoting Mitchell v. State,777 So.2d 312, 313 (Ala.Crim.App. 2000), citing in turn Lancaster v.State, 638 So.2d 1370, 1374 (Ala.Crim.App. 1993) (Bowen, P.J., dissenting). Relief was correctly denied on this ground.
 III.
Giles argues that he was denied the effective assistance of counsel at all stages of his capital-murder trial and at sentencing.
To prevail on a claim of ineffective assistance of counsel, the petitioner must meet the two-pronged test articulated by the United States Supreme Court in Strickland v. Washington,466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). The petitioner must show: (1) that his counsel's performance was deficient and (2) that he was prejudiced by the deficient performance. As the United States Supreme Court stated in Strickland:
 "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act *Page 981 
or omission of counsel was unreasonable. Cf. Engle v. Isaac, 456 U.S. 107, 133-134, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982). A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.' See Michel v. Louisiana, [350 U.S. 91], at 101 [76 S.Ct. 158] [(1955)]. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."
466 U.S. at 689.
As the United States Court of Appeals for the Eleventh Circuit stated in Chandler v. United States, 218 F.3d 1305 (11th Cir. 2000):
 "The purpose of ineffectiveness review is not to grade counsel's performance. See Strickland [v. Washington], [466 U.S. 668,] 104 S.Ct. [2052] at 2065 [(1984)]; see also White v. Singletary, 972 F.2d 1218, 1221 (11th Cir. 1992) (`We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.'). We recognize that `[r]epresentation is an art, and an act or omission that is unprofessional in one case may be sound or even brilliant in another.' Strickland, 104 S.Ct. at 2067. Different lawyers have different gifts; this fact, as well as differing circumstances from case to case, means the range of what might be a reasonable approach at trial must be broad. To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable. But, the issue is not what is possible or `what is prudent or appropriate, but only what is constitutionally compelled.' Burger v. Kemp, 483 U.S. 776, 107 S.Ct. 3114, 3126, 97 L.Ed.2d 638 (1987).
 ". . . .
 "Because the reasonableness of counsel's acts (including what investigations are reasonable) depends `critically' upon `information supplied by the [petitioner]' or `the [petitioner]'s own statements or actions,' evidence of a petitioner's statements and acts in dealing with counsel is highly relevant to ineffective assistance claims. Strickland, 104 S.Ct. at 2066. `[A]n inquiry into counsel's conversations with the [petitioner] may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.' Id. (`[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable.')."
Chandler, 218 F.3d at 1313, 1318-19 (footnotes omitted). "We have recognized that, given these principles and presumptions, `the cases in which habeas [similar to Rule 32] petitioners can properly prevail . . . are few and far between.'" Chandler,218 F.3d at 1313, quoting Waters v. Thomas, 46 F.3d 1506, 1511 (11th Cir. 1995).
Giles was represented at his first and second trial by attorneys John Carroll and Dennis Balske. At Giles's third sentencing *Page 982 
hearing he was represented by attorneys Herb Sparks and Thomas Prickett.
 A.
Giles first argues that his attorneys failed to investigate Giles's use of the drug phencyclidine, commonly known as PCP or "angel dust" and present evidence of his use in mitigation.
The circuit court made very detailed findings on this issue:
 "[Dennis] Balske and [John] Carroll represented Giles aggressively. In preparation for trial, they conducted extensive investigations into Giles's drug use and mental health background. The record is replete with indications that such an investigation was performed.
 "In his deposition in this case, Balske recalled he discussed drugs with Giles. Balske recalled pursuing the drug issue, talking with Giles and reading reports from people doing the investigation of the facts for the defense. He recalled pursuing the issue to determine the types of drugs Giles was using. He remembered that he knew more about Giles's drug use at second trial and specifically remembered there was more than one kind of drug being used. More specifically Balske recalled Giles telling defense counsel about `partying' the night of murders. Balske recalled learning that alcohol and marijuana, and maybe other drugs, had been used. In discussing his drug use, Giles could have told Balske he used PCP, but Balske could no longer remember if Giles did tell him. Balske did recall, however, being told about other drugs by other witnesses. Balske believed that, if he knew about PCP, he would have pursued obtaining an expert to learn about effects of that drug.
 "At the evidentiary hearing in this matter, Dr. William A. Morton, Jr., Doctor of Pharmacy, a professor of pharmacy at the University of South Carolina, testified for the Petitioner as an expert in pharmacology and the effects of certain drugs on human beings. In his testimony, Dr. Morton confirmed that defense records showed Giles's drug use was extensively investigated. Morton stated he learned of Giles's drug use from three sources, the medical records from Bryce hospital, Giles's self-reporting, and notes of interviews supplied to him by Giles's present attorney. . . .
 "Bernard Harcourt, one of Giles's last appellate counsel, verified that an extensive investigation was conducted and experts were consulted. Harcourt testified that, from his review of the defense files, Balske had done a lot of work developing mitigation evidence. Harcourt confirmed that investigators spoke to a lot of witnesses and that the files contained a lot of `mental health work-up.'
 "Prior to trial, Balske and Carroll also took the depositions of Dr. Thomas L. Smith and Dr. James C. Thompson, the psychiatrists who examined Giles for the Lunacy Commission Report. From Dr. Thompson, they learned that Giles did not suffer from any mental illness or extreme emotional disturbance. Dr. Thompson believed that Giles was capable of assisting in his own defense and knew right from wrong at the time of the offense.
 ". . . .
 "The defense at the first two trials, according to Balske, made a strategic decision not to pursue the drug angle at trial. Balske testified the defense felt that, `from what we knew, that it would be viewed more — as more aggravating than mitigating, and therefore, I think we purposely steered away from the drugs. That's my recollection of what *Page 983 
we did.' Trial counsel decided that a drug use defense would only inflame the jury and work against gaining any sympathy from the jury. Counsel, for this reason, made a conscious strategic decision not to pursue drugs as a defense. This decision was based on counsel's thorough investigation of Giles's drug use.
 ". . . .
 "In her deposition in this proceeding, Melinda Faye Fisher testified concerning Giles's drug use on the night of the murders. This Court does not find Ms. Fisher's testimony to be credible. That testimony is, therefore, discounted by this Court. Ms. Fisher was 15 years old in 1978. According to Ms. Fisher, she spent a good part of the evening with Giles. She was Aaron Jones's girlfriend and partied with Jones and Giles the evening before the murders. She said she last saw Giles at 9:30 or 10:00 p.m. the evening before the killings. She also said that her brother Michael, made her go inside and would not let her go with Giles and Jones to Blount County because they had been drinking too much and `shooting up.' Ms. Fisher said her brother then came in the house and told her Giles and Jones had asked him to go with them and he had refused. Ms. Fisher's testimony about the time of this event contradicts Michael Fisher's trial testimony. Ms. Fisher says she last saw Giles with Michael around 9:30 or 10:00 p.m. Michael testified that he last saw Giles and refused to ride with him at 7:00 p.m. Ms. Fisher's testimony also contradicts the testimony of Giles's mother, Isophene Snow, who testified that she last saw Giles at around 9:00 p.m. the evening before the murders and he was neither drinking nor drunk at that time. Ms. Snow also saw him early the next morning, before his arrest, and he did not appear drunk at that time. Ms. Fisher testified in deposition that she also did not testify at any of the legal proceedings against Aaron Jones, whom this Court notes has also been convicted and sentenced to death for these murders. According to Ms. Fisher's deposition in this case, her testimony about drug use would have been similar for Aaron Jones. Apparently, defense counsel for both refused to present this witness to the jury.
 "Even if the Court did believe the testimony of Ms. Fisher, there is still no evidence of significant drug or alcohol use by Giles at the time of the murders. Ms. Fisher stated that she last observed Giles drug use at around 9:30 or 10:00 p.m. the evening before the murders. Michael Fisher placed the last drug or alcohol use at around 7:00 p.m. Ms. Snow found Giles to be sober at around 9:00 p.m., and Giles has never admitted to any significant use of drugs or alcohol on the night of the murders. He only admitted to drinking some Scotch and beer. In addition, the psychiatrists who examined Giles for the Lunacy Commission Report also did not find that Giles was under the influence of drugs or alcohol at the time of the murders. Based on this evidence, the Court finds that defense counsel acted reasonably in failing to argue Giles's drug or alcohol use as a defense to the capital murder charges.
 "This Court now turns to whether counsel was ineffective for failing to present evidence of significant drug use as mitigation at the sentence phase of the trial. This Court is aware that a strategic decision not to pursue a defendant's drug use has been repeatedly recognized as reasonable. As the United States Court of Appeals Eleventh Circuit stated, `[p]recedents show that many lawyers justifiably fear introducing *Page 984 
evidence of alcohol and drug use.' Clisby v. State, 26 F.3d 1054, 1056 (11th Cir. 1994), cert. denied, 513 U.S. 1162, 115 S.Ct. 1127, 130 L.Ed.2d 1089
(1995) (citing Rogers v. Zant, 13 F.3d 384, 386-88 (11th Cir. 1994); White v. Singletary, 972 F.2d 1218, 1225-26 (11th Cir. 1992) and Woomer v. Aiken, 856 F.2d 677, 684 (4th Cir. 1988)) (decision to omit drug use evidence found reasonable in part due to `the common knowledge that many find it difficult to view the illegal use of narcotics under any circumstances as a mitigating factor'), cert. denied, 489 U.S. 1091, 109 S.Ct. 1560, 103 L.Ed.2d 862 (1989).
 "Counsel's decision was reasonable. They made a strategic decision after investigation not to present evidence of drug use or abuse but instead chose to portray Giles as sympathetically as possible, showing him to be a good family member, a sympathetic and helpful person as a child, and a good worker and employee. Counsel was able to show these aspects of Giles's character through the testimony of Ms. Snow. Also, counsel at the 1991 sentence phase chose to focus on the fact that Giles's life was worth saving because of the good he could do and had done while counseling others while in prison. This evidence was shown through the testimony of Mr. Godfried from the prison ministries program. The evidence presented was sufficiently compelling to the jury to produce a jury recommendation of life without parole. The defense strategy, therefore, was successful."
(Supplemental record, p. 69-96.)
Giles specifically argues that the circuit court erroneously discounted the testimony of Melinda Fisher that Giles was using PCP on the day and night of the murders. As noted in the circuit court's thorough order, Fisher's testimony was in direct conflict with Giles's mother's testimony. As we stated recently inJenkins v. State, [Ms. CR-97-0864, February 27, 2004] ___ So.2d ___ (Ala.Crim.App. 2004):
 "`The resolution of . . . factual issue[s] required the trial judge to weigh the credibility of the witnesses. His determination is entitled to great weight on appeal. . . . "When there is conflicting testimony as a factual matter . . ., the question of the credibility of the witnesses is within the sound discretion of the trier of fact. His factual determinations are entitled to great weight and will not be disturbed unless clearly contrary to the evidence."'"
___ So.2d at ___, quoting Calhoun v. State, 460 So.2d 268,269-70 (Ala.Crim.App. 1984).
Moreover, it appears that Giles may not have informed his attorneys about his alleged use of PCP on the night of the murders.
 "The reasonableness of counsel's investigation and preparation . . . often depends critically upon the information supplied by the defendant. E.g. Commonwealth v. Uderra, 550 Pa. 389, 706 A.2d 334, 340-41 (1998) (collecting cases). Counsel cannot be found ineffective for failing to introduce information uniquely within the knowledge of the defendant and his family which is not provided to counsel."
Commonwealth v. Bond, 572 Pa. 588, 609-10, 819 A.2d 33, 45-46
(2002). Giles failed to satisfy the Strickland test.
 B.
Giles argues that counsel failed to investigate and uncover a drug dealing relationship between Carl Nelson and Giles.
The circuit court made the following findings on this issue: *Page 985 
 "Giles stated in his confession that he had a prior relationship with the Nelson family. He stated that he had worked for Carl Nelson on his farm. Giles stated Nelson had, at some point, offered to sell him an acre of marijuana, assuming he had the money because Giles drove a nice car. Giles also stated he had left Nelson's employ because of a misunderstanding concerning some money that Giles was accused of stealing. All of this information was in Giles's confession and known to defense counsel at every stage of Giles's trial. No admissible evidence of any additional relationship has been submitted in this proceeding.
 "Giles presented two witnesses who testified concerning a drug-dealing relationship between Giles and Carl Nelson, one of the victims. These two witnesses testified concerning hearsay knowledge of Giles's relationship with Carl Nelson. Both witnesses acknowledged they had never seen Giles with Mr. Nelson or buy drugs from Mr. Nelson. They were only reporting what they said Giles told them. Giles did not testify in this proceeding and offered no direct evidence to support this claim.
 "Dennis Balske testified that he did not recall looking into the history between Nelson and Giles. Nor did Balske recall Giles telling counsel anything that counsel should pursue. Even if such a relationship did exist, it escapes this Court how such a relationship could have been used to affect the outcome of this proceeding. Giles murdered not only Mr. Nelson but also Mrs. Nelson. Giles injured four other family members, including two children and an elderly woman, in the attack. There is no evidence, even hearsay, that any of these other victims had had a drug-dealing relationship with Giles.
 "In his confession, Giles stated he and Jones went to the Nelson home to commit a robbery, not because of any drug-dealing relationship. Giles entered the home at 3:00 a.m., uninvited, and was told to leave. Instead of leaving, he came back inside and shot everyone in the home, except little Charlie Nelson. Giles went back outside and returned with his codefendant, Aaron Jones. Giles and Jones participated in stabbing four of the family members. Two of these victims died from his unprovoked attack. Giles and Jones went outside the home, but one of them returned immediately to finish the robbery. The Court finds, and Giles proved, no theory pursuant to which evidence of a dealer/gopher relationship could have aided the defense in this case. Giles had therefor failed to prove either part of the Strickland test as to this claim. This claim is, therefore, denied."
(Supplemental record, p. 98-99.)
Giles specifically argues that the circuit court erroneously failed to consider the hearsay testimony of two witnesses as to what Giles told them about a drug relationship between him and Carl Nelson. Giles argues that the circuit court misapplied the evidentiary rules governing capital sentencing because hearsay evidence is admissible at the sentencing portion of a capital-murder trial.
However, what Giles fails to consider is whether the Rules of Evidence apply to Rule 32 proceedings. See Rule 101, Ala.R.Evid., and Rule 1101(a), Ala.R.Evid., which states, in part, "these rules of evidence apply in all proceedings in the Courts of Alabama. . . ." Rule 1101(b), Ala.R.Evid., lists the proceedings exempt from application of the Rules of Evidence. Those proceedings include proceedings concerning preliminary questions of fact, grand jury proceedings, extradition proceedings, preliminary hearings in criminal *Page 986 
cases, sentencing or probation revocation hearings, proceedings related to the issuance of a warrant of arrest, criminal summonses, or search warrants, bail proceedings, and contempt proceedings.
The Rules of Evidence apply to postconviction proceedings. SeeDeBruce v. State, 890 So.2d 1068 (Ala.Crim.App. 2003). Rule 804, Ala.R.Evid., specifically excludes hearsay evidence. The circuit court correctly applied existing law and excluded the hearsay statements presented concerning an alleged drug relationship between Giles and one of the victims. After excluding the hearsay evidence, the circuit court was left with no lawful evidence to support this contention. Relief was correctly denied on this ground. See DeBruce, supra.
 C.
Giles also makes several arguments concerning the performance of his counsel at the 1991 sentencing hearing. Without specifically addressing each contention, we find that Giles cannot possibly establish any prejudice. The jury at the 1991 hearing did not return a death recommendation. Therefore, because the jury recommended the more lenient of the two available sentences Giles suffered no prejudice. Giles v. State,632 So.2d at 574. Giles cannot satisfy the Strickland test.
 D.
Giles argues that his counsel erred in failing to investigate and present evidence of self-defense — that Carl Nelson was armed with a gun and told Giles that "if he didn't leave he would leave in a pine box."
The circuit court stated the following:
 "This claim is a bare conclusory allegation that is unsupported by fact and is, therefore, dismissed pursuant to Rule 32.6(b), Ala.R.Crim.P. Even if this claim had been reviewed by this Court, the claim would have been denied. Giles failed to argue this claim and failed to advise this Court of any facts in support of this claim. In addition, this Court has found no authority supporting this claim under the facts and circumstances of this case. Under the facts of this case, any attempt to argue such a defense borders on the ludicrous. Giles's actions fall completely outside the scope of self-defense.
 ". . . .
 "In this case, Giles could have avoided shooting anyone if he had left the Nelson homestead the first time he left the Nelson home, even considering the circumstances under which he entered the home, intent on robbing the occupants. Instead, he left the home; went to his car; armed himself with a loaded gun; re-entered the hone and murdered Carl and Willene Nelson. Self-defense was not an option available to the defense."
(Supplemental record, p. 100-02.)
The record shows that neither of Giles's trial attorneys was questioned concerning this issue. Nor is there any indication in the record that Carl Nelson was armed with a gun at the time of his murder. Giles failed to meet his burden in regard to this issue. See Rule 32.3, Ala.R.Crim.P.
 E.
Giles argues that Carroll and Balske failed to seek funds and present expert testimony on the effects of using PCP.
The circuit court stated the following:
 "As shown above, guilt phase counsel, after much investigation, decided not to pursue a drug defense. Sentence phase counsel also chose, as a matter of strategy, not to pursue drug use as a defense *Page 987 
evidence. In addition, no credible evidence of prolonged use of PCP was presented to this Court. Giles relies on the testimony of Ms. Fisher and Ricky Davis to establish a prolonged use of PCP. As stated earlier, the court does not find the testimony of these witnesses to be credible. Ms. Fisher's testimony conflicted with that of other witnesses and with Giles's self reporting to the staff at Bryce Hospital. Ricky Davis appeared before this Court, and this Court had the opportunity to observe him while he testified. His testimony differs from Giles's drug use as self-reported to the staff at Bryce Hospital and from other medical records submitted to this court in these proceedings. From his demeanor and because his testimony conflicts with Giles's own self reporting, this Court did not find Ricky Davis a credible witness.
 "In addition, this Court notes that counsel's decision to pursue drugs as a defense or in mitigation constitutes a reasonable strategy. As set out above, courts have recognized that defense lawyers are justifiably skeptical of asserting drug use as an excuse or as mitigation evidence. . . .
 "At the evidentiary hearing in this matter, Giles presented the testimony of Dr. Williams Morton, a Ph.D. expert in pharmacology, the study of the reaction of drugs on the human body. Dr. Morton testified concerning the history and effects of PCP usage. He also testified that PCP use can lead to impulsive, unpredictable violence in some people. From the facts of the crime, he deduced that Giles was on PCP at the time the offenses were committed. He decided that Giles used PCP based on evidence never presented in court; i.e., previous attorney interviews with potential witnesses and Giles's self-reporting to him for twenty minutes before Morton testified in the hearing. The psychiatrists, medical doctors trained to diagnose based on a full patient history and psychiatric exam, found to the contrary. This Court finds defense counsel's strategy was reasonable. The strategy successfully won a verdict of life without parole from the jury. Even if the strategy were second-guessed at this time, Dr. Morton's testimony does not undermine the fairness or reliability of the verdict and sentence in this case. Dr. Morton's testimony, even if considered by this Court, would not have resulted in a sentence other than death for this defendant. See, Stevens v. Zant, 968 F.2d 1076, 1081 (11th Cir. 1992), cert. denied, 507 U.S. 929, 113 S.Ct. 1306, 122 L.Ed.2d 695 (1993) (In a challenge to the imposition of a death sentence, the prejudice part of the Strickland test focuses on whether the sentencer would have still imposed the death penalty after balancing the aggravating and mitigating circumstances.)"
(Supplement record, p. 108-10.)
Carroll stated that funds for experts were available to him even if not approved by the circuit court and that it was a strategic decision not to present evidence of Giles's drug use given the fact that such evidence may be viewed by some jurors as aggravating and by some as mitigating — it was double-edged evidence. "[It] is not our function to second-guess the strategic decisions made by counsel." Smith v. State, 756 So.2d 892, 910
(Ala.Crim.App. 1997), aff'd, 756 So.2d 957 (Ala. 2000). As the United States Supreme Court stated in Strickland v. Washington:
 "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent *Page 988 
that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments."
466 U.S. at 690-91, 104 S.Ct. 2052.
 "See Hernandez v. Johnson, 108 F.3d 554, 562-64 (5th Cir. 1997); West v. Johnson, 92 F.3d 1385, 1410 (5th Cir. 1996), cert. denied, [520] U.S. [1242], 117 S.Ct. 1847, 137 L.Ed.2d 1050 (1997); Woods v. Johnson, 75 F.3d 1017, 1035 (5th Cir.), cert. denied, [519] U.S. [854], 117 S.Ct. 150, 136 L.Ed.2d 96 (1996); Callins v. Collins, 998 F.2d 269, 278 (5th Cir. 1993), cert. denied, 510 U.S. 1141, 114 S.Ct. 1127, 127 L.Ed.2d 435 (1994) (all rejecting ineffective-assistance claims where alleged failures to investigate mitigating evidence did not prejudice the defendant because of the double-edged nature of the evidence available)."
Cockrum v. Johnson, 119 F.3d 297, 304-05 (5th Cir. 1997).
The record shows that Carroll and Balske did a thorough investigation before Giles's trial, were thoroughly prepared at trial, and put on an aggressive defense. However, the evidence against Giles was overwhelming. Counsel's strategic choice not to present evidence of Giles's drug use was not unreasonable. Giles failed to satisfy the Strickland test.
 F.
Giles argues that the circuit court erred in denying 17 of his ineffective-assistance-of-counsel claims.[14] In his brief Giles merely identifies each issue but fails to make any argument or citation to authority in support of each issue. (Giles's brief, pp. 97-100.)
Because Giles failed to assert any legal argument or supporting legal authorities for each of these issues, Giles has waived these arguments on appeal. As we stated in Hamm v. State, [Ms. CR-99-0654, February 1, 2002] ___ So.2d ___ (Ala.Crim.App. 2002):
 "Hamm includes a list of more than 20 allegations of ineffective assistance of trial counsel, and he offers no citations to the record or to any legal authority to support his specific allegations. Instead, Hamm states that he `has set out *Page 989 
in detail the deficiencies of counsel's performance in his petition for habeas corpus relief,' and he invites this Court to examine the claims comprehensively. This type of `scattergun' approach to appellate argument is forbidden by Rule 28(a)(5), Ala.R.App.P. That rule requires parties to include in their appellate briefs an argument section with citations to relevant legal authorities and to portions of the record relied on in their claims for relief. Recitation of allegations without citation to any legal authority and without adequate recitation of the facts relied upon has been deemed a waiver of the arguments listed. Gay v. State, 562 So.2d 283, 289 (Ala.Crim.App. 1990). . . . Hamm has forfeited any right of review to the remaining claims from the `laundry list' of claims set out on pages 88-89."
___ So.2d at ___ (footnote omitted).
Part K of Giles's brief fails to comply with Rule 28(a)(10), Ala.R.App.P. This rule addresses the requirements for the argument section of an appellate brief; it states:
 "An argument containing the contentions of the appellant with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on. Citations of authority shall comply with the rules of citation in the latest edition of either The Bluebook: A Uniform System of Citation or ALWD [Association of Legal Writing Directors] Citation Manual: A Professional System of Citation or shall otherwise comply with the style and form used in opinions of the Supreme Court of Alabama. Citations shall reference the specific page number(s) that relate to the proposition for which the case is cited."
If we were to address the laundry list of issues identified in Part K of Giles's brief, we would in effect be applying the plain-error standard of review to the appeal of a postconviction petition in a capital case. The plain-error standard of review is not the standard used when reviewing the denial of a Rule 32 petition in a capital case. Hill v. State, 695 So.2d 1223
(Ala.Crim.App. 1997).
When a brief fails to comply with Rule 28(a)(10), Ala.R.App.P., to such an extent that it impedes the ability of the reviewing Court to consider the merits of an issue, we have no option but to conclude that the issue has been waived on appeal. See Hamm.
Because Giles has failed to offer this Court any argument as to why the circuit court erred in denying relief on these grounds, we find that Giles has forfeited his right to have this Court review these issues.
 G.
Giles argues in Part L of his brief to this Court that the circuit court erred in denying his ineffective-assistance-of-counsel claims for lack of specificity. His brief concerning this issue consists of the following argument:
 "In the second amended petition Giles identified forty (40) specific instances of ineffectiveness. In the third amended petition Giles identified additional claims of ineffectiveness. The detail provided in these numerous clear and specific claims belies their dismissal as `a bare allegation that a constitutional right has been violated.' Thus, the first error appealed is the denial of claims which are sufficiently specific."
(Giles's brief, p. 101.) The only portion of this section where Giles identifies any issues is the following comment:
 "Giles does not merely allege a failure to present mitigation evidence, Giles *Page 990 
specifically pled the issues of imperfect self-defense, prolonged PCP use, toxic psychosis, childhood neglect, and juvenile mental illness."
(Giles's brief, p. 102.)
Because Part L of Giles's brief is totally devoid of argument and therefore does not comply with the requirements of Rule 28(a)(10), Ala.R.App.P., we find that these issues are waived for appellate review. See Hamm, supra.
 IV.
In Part FF of Giles's brief entitled, "Appeal of error from Rule 32 proceedings," Giles lists several adverse rulings made by the circuit court but fails to assert any argument in support of these contentions. Because this section is totally devoid of argument and therefore does not comply with the requirements of Rule 28(a)(10), Giles has waived his right to have this Court review these issues. See Hamm, supra.
 V.
Giles makes several arguments in his brief that are procedurally barred in this postconviction proceeding. Those issues are:
 A. Whether his conviction was obtained by the use of a coerced confession;
 B. Whether the prosecutor's argument in closing was improper;
 C. Whether the trial court erred in refusing to instruct the penalty phase jury on returning a recommendation of life without parole;
 D. Whether his penalty phase was infected with improper prosecutorial comments;
 E. Whether the trial court erred in not allowing Giles to address the jury before opening statements;
 F. Whether the jury for his 1991 sentencing hearing was improperly empaneled;
 G. Whether the trial court improperly limited the scope of voir dire at his 1991 sentencing;
 H. Whether the trial court improperly allowed the state to exercise more peremptory strikes than the defense.
All of these issues were procedurally barred because they could have been raised on direct appeal. See Rule 32.2(a)(5), Ala.R.Crim.P.
 VI.
Giles argues that the circuit court breached the separation-of-powers doctrine by abdicating the decision-making authority to the attorney general. He specifically argues that the circuit court erred in its wholesale adoption of the State's proposed order denying postconviction relief.
We have repeatedly upheld the adoption of the State's proposed order denying postconviction relief when the evidence introduced supports the law and facts. As this Court stated in Morrison v.State, 551 So.2d 435 (Ala.Crim.App. 1989):
 "`[E]ven when the trial judge adopts proposed findings verbatim, the findings are those of the court and may be reversed only if clearly erroneous.'
 "`"[A] finding is `clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake as been committed." United States v. United States Gypsum Co., 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948). . . . If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that *Page 991 
had it been sitting as the trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous. United States v. Yellow Cab Co., 338 U.S. 338, 342, 70 S.Ct. 177, 179, 94 L.Ed. 150
(1949); see also Inwood Laboratories, Inc. v. Ives Laboratories, Inc., 456 U.S. 844, 102 S.Ct. 2182, 72 L.Ed.2d 606 (1982).' Id., 470 U.S. at 573-74, 105 S.Ct. at 1511."
551 So.2d at 436-37. For the reasons detailed above, we hold that the circuit court's findings are not clearly erroneous; therefore, we find no reversible error in the circuit court's adoption of the State's proposed order.
For the forgoing reasons, the circuit court correctly denied Giles's postconviction petition. We affirm its judgment.
AFFIRMED.
McMILLAN, P.J., and BASCHAB and SHAW, JJ., concur. COBB, J., recuses herself.
[1] Giles's codefendant, Aaron Jones, was also convicted of capital murder and was sentenced to death. His conviction and sentence were affirmed on direct appeal. See Jones v. State,520 So.2d 543 (Ala.Crim.App. 1984), aff'd, 520 So.2d 553 (Ala. 1988).
[2] This law was changed in 1981. Section 13A-5-46(f), Ala. Code 1975, specifically states, in part, "The decision of the jury to return an advisory verdict recommending a sentence of life imprisonment without parole must be based on a vote of a majority of the jurors. The decision of the jury to recommend a sentence of death must be based on a vote of at least 10 jurors."
[3] This rule was amended effective August 1, 2002, to shorten the limitations period to one year.
[4] We note that the certificate of service is dated February 2, 1996, and reflects that the petition was deposited in the United States Postal Service as certified registered mail. However, the only rule to allow an individual the benefit of the date of mailing is Rule 25, Ala.R.App.P. That Rule specifically applies only to filings made in a state appellate court. The first sentence of Rule 25(a), Ala.R.App.P., states: "Papers required or permitted to be filed in an appellate court shall be filed with the clerk."
[5] Though the certificate of service for the third amended petition is dated August 11, 2000, there is no provision similar to Rule 25, Ala.R.App.P., allowing a party the benefit of the mailing date when filing papers in a circuit court. Even if there were a comparable provision, however, the certificate of service was not sufficient. The certificate of service read: "I certify that on this date I served a copy of the attached filing, `Third Amended Petition for Relief from Conviction and Sentence of Death Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure' on opposing counsel, by mail a copy via Federal Express. . . ." According to Rule 25(a), Ala.R.App.P., a party is allowed the benefit of the mailing date only when the filing is accomplished by "certified, registered, or express mail of the United States Postal Service. . . ."
[6] The date that a judgment is stamped filed in the circuit clerk's office is the date used for calculating the notice of appeal. "This Court has held that the date of entry by the clerk, rather than the date the judgment is rendered, should be used when computing the time within which the notice of appeal must be filed." Ex parte Potts, 814 So.2d 836, 838 n. 1 (Ala. 2001).
[7] We note that this third amended petition was filed well outside the filing deadline set by the circuit court.
[8] This does not prevent a petitioner from raising a Brady
claim as a newly discovered evidence claim under Rule 32.1(e), Ala.R.Crim.P.
[9] The record shows that the charges against Nelson had been dismissed.
[10] One witness was cross-examined about this at the third sentencing hearing.
[11] Brenda Nelson was shot above one eye and lost her left eye as a result of the shooting.
[12] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602,16 L.Ed.2d 694 (1966).
[13] This Court may take judicial notice of our prior records on appeal. Ex parte Salter, 520 So.2d 213, 216 (Ala.Crim.App. 1987).
[14] The laundry list of those issues, as stated in Giles's brief, are: failure to object to the malice instruction, failure to object to the particularized-intent instruction, failure to secure the suppression of Giles's allegedly inadmissible statement and to raise the issue on appeal, failure to object to the presence of his codefendant at Giles's trial, failure to secure an impartial jury, failure to investigate the culpability of Aaron Jones, failure to present mitigation evidence in support of a case for life imprisonment without parole, improper and prejudicial closing arguments in defense, failure to object to prosecutor's allegedly improper closing arguments, failure to object at trial to the Court's override of the jury's verdict of life imprisonment, failure to object to the remand for a third sentencing hearing, failure to object at resentencing to absence of evidence of aggravating circumstance averred in indictment, failure to object to trial court's finding of aggravating circumstance that Giles exposed others to "great risk of death," failure to secure client's participation in closing and raise the issue on appeal, failure to secure a residual-doubt instruction and to raise that issue on appeal, failure to object to unequal distribution of peremptory challenges, failure to exclude allegedly inflammatory pictures and to raise that issue on appeal, and failure to object to court's consideration of allegedly improper pre-sentence report and raise issue on appeal.